53 S.W.3d 310 (2001)
PUBLIC UTILITY COMMISSION OF TEXAS, et al., Petitioners,
v.
CITY PUBLIC SERVICE BOARD OF SAN ANTONIO and Houston Lighting & Power Company, Respondents.
No. 00-0156.
Supreme Court of Texas.
Argued December 6, 2000.
Decided June 28, 2001.
Rehearing Overruled September 20, 2001.
*311 Philip R. Segrest, Shannon M. Sanders, Segrest & Segrest, McGregor, Jim McDermitt, Riley & McDermitt, Waco, Ronald Lynn Beal, Jo Campbell, Waco, for Petitioner.
*312 William B. Wagner, Marcy H. Greer, Marc Brian Collier, Louis S. Zimmerman, Filbright & Jaworski, Austin, Jon Clair Wood, W. Roger Wilson, Matthews & Branscomb, San Antonio, Robert J. Hearon, Jr., P.M. Schenkkan, Thomas B. Hudson, Jr., Ron H. Moss, Robin A. Melvin, Graves Dougherty Hearon & Moody, Austin, Hugh Rice Kelly, Houston, for Respondent.
Justice ENOCH delivered the opinion of the Court, joined by Chief Justice PHILLIPS, Justice OWEN, Justice BAKER, Justice HANKINSON, and Justice JEFFERSON.
The Texas Legislature enacted the Public Utility Regulatory Act of 1995 (PURA95) to promote competition in the wholesale electricity market.[1] In PURA95, the Legislature instructed the Public Utility Commission to "adopt rules relating to wholesale transmission service, rates, and access."[2] We must decide whether the Commission exceeded this statutory authority when it promulgated rules establishing the rates that most Texas electric utilities must pay for wholesale transmission service. The court of appeals held that the Commission did exceed its authority.[3] We affirm the court of appeals' judgment.

I. BACKGROUND
The electric industry has three principal components: power generation, power transmission, and power distribution. Transmission, the component at issue in this case, involves transporting electricity over a utility's power lines. Texas's electric utilities have voluntarily interconnected their transmission systems, enhancing reliability and providing opportunities for utilities to purchase power from one another. This interconnected network of transmission lines forms a single grid within the state, known as the Electric Reliability Council of Texas (ERCOT). Although two other regional power grids serve parts of the state, ERCOT serves the majority of the state. In addition, because ERCOT is a wholly intrastate power grid, the federal scheme that the Federal Energy Regulatory Commission (FERC) administers does not generally govern ERCOT.
Power can be moved from any point on the ERCOT grid to any other point on the grid. When a utility purchases wholesale electric power, that power must be transported from the seller to the buyer. Because not all wholesale transactions occur between a buyer and seller whose transmission networks are directly interconnected, and because some power generators own no transmission lines, buyers and sellers must often transmit or "wheel" power across transmission facilities belonging to third parties. Before PURA95, utilities in ERCOT provided wholesale transmission services to each other primarily on an individual, contractual basis.

II. PURA95
With PURA95, the Legislature endeavored to establish competition in the wholesale electricity market. The Legislature amended the existing Public Utility Regulatory Act (PURA) by adding provisions that in 1997 were codified at Subchapter A of Chapter 35 of the Utilities Code.[4] These *313 provisions required all transmission-owning utilities to provide "open access" to their transmission facilities for wholesale transmission.
First, the amendments authorize the Commission to "require a utility ... to provide transmission service at wholesale to another utility," and to "determine whether the terms and conditions for the transmission service are reasonable."[5] Next, the amendments specify that utilities owning or operating transmission facilities "shall provide wholesale transmission service at rates, terms of access, and conditions that are comparable to the rates, terms of access, and conditions of the utility's use of its system."[6] The Commission is responsible for "ensur[ing] that utilities provide nondiscriminatory access to transmission service...."[7] Moreover, when a utility provides wholesale transmission service at a third party's request, the amendments instruct the Commission to "ensure that the costs of the transmission are not borne by the utility's other customers by requiring the utility to recover from the entity for which the transmission is provided all reasonable costs incurred by the utility in providing transmission services necessary for the transaction."[8]
Central to this dispute, PURA95 also provides that "[t]he [C]ommission shall adopt rules ... relating to wholesale transmission service, rates, and access."[9] These rules are to (1) be consistent with PURA95's standards; (2) not be contrary to federal law; and (3) require transmission services not less than the FERC could require in similar circumstances.[10] PURA95 mandates that all utilities owning or operating transmission services file tariffs with the Commission that are consistent with the Commission's rules.[11] Finally, PURA95 permits the Commission to "require that parties to a dispute over the prices, terms, and conditions of wholesale transmission service engage in a nonbinding alternative dispute resolution process before seeking a resolution from the [C]ommission."[12]

III. THE COMMISSION'S RULES
Responding to PURA95's command, the Commission adopted transmission rules 23.67 and 23.70, effective in March 1996.[13] Rule 23.67 completely replaced the existing rule 23.67, while rule 23.70 was new. Although the rules are extensive, the limited challenge before us relates to the provision that each ERCOT utility pay every other ERCOT utility a "facilities charge" for transmission services.[14] Thirty percent *314 of the facilities charge consists of an "impact fee."[15] This fee is calculated using a methodology called "vector-absolute megawatt mile," or "VAMM."[16] VAMM is a distance-sensitive calculation that measures the effects that a utility's planned transmission transactions have on other utilities' transmission systems.[17] The parties do not challenge this part of the facilities charge.
Rather, the parties challenge the other seventy percent of the facilities charge. This remaining part is called the "access fee." The access fee is based on each utility's percentage of use of the ERCOT grid.[18] The Commission calculated the access fee by first aggregating all ERCOT utilities' transmission costs. The Commission then determined the maximum amount of electricity, or "total peak load," for the entire grid for 1997 and each utility's percentage of that total.[19] Next, the Commission multiplied each utility's percentage of the total ERCOT peak load by the aggregate transmission costs for the entire grid to determine that utility's total access fee. Thus, for example, because Houston Lighting and Power's peak load for 1997 was 26% of the total ERCOT peak load for that year, HL & P's total access fee was 26% of the total ERCOT transmission costs. The Commission calls the access fee a "statewide postage stamp rate," because it does not depend on the distance the power travels.
After promulgating its new rules, the Commission held a series of contested-case hearings to set the specific facilities charge for each utility. The Commission based the total revenue each utility was to receive on the ratio of its transmission costs to the total system-wide transmission costs.[20] Following the hearings, the Commission released a matrix setting out each utility's payments to each other utility.[21] The access fee one utility pays to another is based on the payor's percentage of the ERCOT peak load and the recipient's total transmission costs.[22] For instance, if the payor utility uses 10% of the ERCOT peak load, it pays each recipient utility 10% of the recipient utility's total transmission costs.

IV. THE LAWSUIT
Respondents City Public Service Board of San Antonio (San Antonio) and HL & P sued the Commission in separate actions, seeking a declaration that the rules were invalid. The two cases were consolidated, and a number of parties appeared and aligned themselves with the Commission to defend the rules.[23] All parties moved for *315 summary judgment. The trial court granted the Commission's motion and denied San Antonio's and HL & P's.
San Antonio and HL & P appealed. Concluding that the Act did not give the Commission express authority to set wholesale transmission rates, the court of appeals reversed the trial court's judgment and rendered judgment that subsections (f), (g), (h), (i), (j), and (m) of Rule 23.67 and subsections (j) and (o) of Rule 23.70 are invalid.[24] We granted the Commission's petition for review.

V. STANDARD OF REVIEW
Our first question is what standard to apply to decide whether the Commission's rules exceed the authority the Legislature gave the Commission in PURA95. In invalidating the rules, the court of appeals relied on this Court's opinion in Humble Oil and Refining Company v. Railroad Commission of Texas.[25] Citing Humble Oil, the court of appeals observed: "The power to fix prices and make rates by a board or commission cannot be conferred by implication. Such power must be conferred under statutory or constitutional language that is free from doubt, and that admits of no other reasonable construction."[26]
The Commission argues that the court of appeals erred in examining PURA95 under a "super standard" to determine whether the Legislature clearly and explicitly authorized the Commission to set rates. The true test of whether its rules are permissible, the Commission says, is whether the rules are in harmony with the statute, regardless of how vague or explicit the statute is. San Antonio and HL & P counter that the court of appeals correctly followed Humble Oil, which confirmed that the power to set rates is unique and cannot be conferred except by explicit language.
Despite some suggestive language, however, Humble Oil established no special rule for conferring ratemaking power. In fact, Humble Oil fits within the ordinary rules we apply to decide whether a state agency has exceeded its authority. The basic rule is that a state administrative agency has only those powers that the Legislature expressly confers upon it.[27] But an agency may also have implied powers that are reasonably necessary to carry out the express responsibilities given to it by the Legislature.[28] The power to set rates is no different from any other power.
Although it was decided more than sixty years ago, we have not cited Humble Oil in more than a handful of cases, and not for the proposition that a different rule governs when a state agency establishes rates.[29] But in fact the proposition that a commission has only those powers conferred upon it in clear and unmistakable language is simply an element of the standard we always apply when asked to review *316 an agency action to see whether the agency has exceeded its statutory authority. As we have said before, "the PUC is a creature of the legislature and has no inherent authority."[30] This is true of every state administrative agency, and as a result every such agency has only those powers expressly conferred upon it by the Legislaturejust as Humble Oil says.[31]
But, as noted earlier, when the Legislature expressly confers a power on an agency, it also impliedly intends that the agency have whatever powers are reasonably necessary to fulfill its express functions or duties.[32] An agency may not, however, exercise what is effectively a new power, or a power contradictory to the statute, on the theory that such a power is expedient for administrative purposes.[33] Moreover, we consider the agency's interpretation of its own powers only if that interpretation is reasonable and not inconsistent with the statute.[34]
Applying the rules in this case, we must first ask whether the Legislature expressly gave the Commission the power to set wholesale transmission rates for all utilities. If not, we must ask whether that power is reasonably necessary for the Commission to fulfill the express functions and duties the Legislature did give it.

VI. DO THE RULES SET RATES?
Another point we consider is whether Rules 23.67 and 23.70 set rates at all. The Commission argues that the rules do not set rates, but merely establish a pricing methodology. According to the Commission, it set any actual rates in a series of contested-case hearings to which the rules required all utilities to submit.[35] Thus, the Commission argues, the court of appeals erred in concluding that the rules set rates in the first place.
PURA's definition of "rate" is broad:
'Rate' includes a compensation, tariff, charge, fare, toll, rental, or classification that is directly or indirectly demanded, observed, charged, or collected by an electric utility for a service, product, or commodity ... and a rule, practice, or contract affecting the compensation, tariff, charge, fare, toll, rental, or classification that must be approved by a regulatory authority.[36]
Under this definition, the Commission's rules set rates.
The rules require each ERCOT grid utility to pay each other utility in the grid a facilities charge for wholesale transmission service.[37] Thus, they establish a "charge ... that is directly or indirectly... collected by an electric utility for a service...."[38] Moreover, the rules explain that the facilities charge must consist of the access fee and the impact fee. No utility has a choice about whether to collect *317 or pay the facilities charge. The elements of the charge are non-negotiable. The only issue for a contested case hearing is to ascertain the precise numbers for each utility. And, as the Commission itself points out, the rules require all utilities to submit to such a hearing to have their rates established.

VII. DOES THE COMMISSION HAVE THE POWER TO SET RATES?
The Commission argues that the court of appeals erred in holding that the Commission has no statutory authority to set wholesale transmission rates. The Commission contends that PURA95 explicitly gives it such authority. Even if PURA95 does not, the Commission asserts that it has always had ratemaking power at least for HL & P, because HL & P is an investor-owned utility traditionally subject to the Commission's jurisdiction to establish rates. As we will explain, we agree that the Commission has the power generally to set HL & P's rates for wholesale transmission service, and that the court of appeals erred in this respect. But we do not agree that the same rationale applies to San Antonio, a municipally owned utility.
The court of appeals erred when it looked only to chapter 35's provisions to find ratemaking authority. The statute must be construed as a whole, and PURA as a whole gives the Commission broad power over certain electric utilities, including investor-owned utilities like HL & P. This power includes the explicit authority to "establish and regulate rates," found in chapter 36.[39] As we have pointed out, the definition of "rate" includes any compensation or charge that a utility demands for a service.[40] PURA defines "service" to include:
any act performed, anything supplied, and any facilities used or supplied by a public utility in the performance of the utility's duties under this title to its patrons, employees, other public utilities, and the public.[41]
This definition encompasses wholesale transmission service that one utility supplies to another.
Further, chapter 36 specifies that "[a]n electric utility may not charge or receive a rate for utility service except as provided by this title."[42] And "service" provides the starting point for setting rates under chapter 36. This point is evident from section 36.051, which commands that:
[i]n establishing an electric utility's rates, the regulatory authority shall establish the utility's overall revenues at an amount that will permit the utility a reasonable opportunity to earn a reasonable return on the utility's invested capital used and useful in providing service to the public in excess of the utility's reasonable and necessary operating expenses.[43]
In view of these statutory provisions, we conclude that chapter 36 permits the Commission to set rates for wholesale transmission service provided by investor-owned utilities.
The chapter further states that the Commission "shall ensure" that the rate a utility demands or receives "is just and reasonable."[44] Moreover, rates may not *318 be "unreasonably preferential, prejudicial, or discriminatory but must be sufficient, equitable and consistent in application to each class of consumer."[45] Finally, the chapter has detailed provisions explaining how the Commission shall determine a utility's rates. For instance, a utility's revenues must permit it to earn a reasonable return on its invested capital.[46] The statute specifies the factors to consider in a "reasonable return," and also delineates "invested capital" components.[47] In establishing a reasonable return for a utility on its invested capital, the Commission must consider "the quality of the utility's services."[48] Additional provisions describe in detail how the Commission must treat other elements involved in establishing rates.[49] Thus, we conclude that the court of appeals erred when it dismissed chapter 36 as applying only to the rates charged to end-users for electricity sales.[50]
In fact, HL & P specifically concedes that chapter 36 gives the Commission the authority to set its wholesale transmission rates. It now argues, however, that the Commission may not set these rates by a statewide rule, but only in a contested-case hearing as chapter 36 requires. But HL & P did not raise this point as a ground for summary judgment in the trial court, and did not argue it before the trial court or the court of appeals. We therefore decline to address it.
San Antonio, however, is another matter. San Antonio is a municipally owned utility, and PURA treats municipally owned utilities differently from investor-owned utilities. Throughout most of PURA, including chapter 36, the term "electric utility" excludes municipally owned utilities like San Antonio.[51] Thus, the Commission's jurisdiction over municipally owned utilities is restricted. Unlike investor-owned utilities, municipally owned utilities retain the ability to set their own rates without the Commission's approval.[52] The Commission may establish rates for a municipally owned utility only in limited circumstances.[53] Thus, the Commission's chapter 36 ratemaking authority does not extend to San Antonio.
But chapter 35, in contrast to the rest of PURA, specifically includes municipally owned utilities in its definition of "electric utility."[54] Consequently, all powers that chapter 35 gives the Commission extend to municipally owned utilities. For the Commission to have the power to set wholesale transmission rates for San Antonio, then, chapter 35 must grant that power. But chapter 35 contains no explicit grant of ratemaking authority. Nor is the power to set rates initially by rule necessarily implied from the specific authority chapter 35 does contain.[55]
First, chapter 35 lacks the clear language the Legislature used in chapter 36nowhere does chapter 35 give the Commission the explicit power to "establish and regulate rates."[56] Nor does chapter *319 35 contain any detail comparable to chapter 36's provisions regarding the factors to be considered in setting wholesale transmission rates. The Commission asserts that the Legislature did not need to repeat such language in chapter 35, because it need not restate in each new statutory section all powers already bestowed on the Commission. While this may be true, the powers bestowed in chapter 36 do not extend to municipally owned utilities. And section 35.001 says that "electric utility" includes municipally owned utilities for Subchapter A of chapter 35 only.[57] Consequently, chapter 35 does not sweep municipally owned utilities into chapter 36's scheme.
Moreover, the specific powers that chapter 35 gives the Commission do not necessarily imply the authority to set rates. The Commission is to "adopt rules relating to wholesale transmission service, rates and access," which must be consistent with chapter 35's standards.[58] Excluding the specific power to "adopt rates" in favor of the power to "adopt rules relating to ... rates" suggests that the Legislature deliberately declined to give the Commission the same kind of authority that it has under chapter 36.[59] The unchallenged parts of Rule 23.67 contain examples of such rules. For instance, Rule 23.67(d) requires utilities to provide ancillary services in conjunction with wholesale transmission service and provides that "such services shall be discretely priced and separately provided on a nondiscriminatory basis[.]"[60] Rule 23.67(e) allows a utility to supply additional ancillary services, with the price to be determined by negotiations between utility and customer.[61] Rule 23.67(o) instructs utilities to make filings with the Commission separating out their costs and rates, based on the costs associated with generation, transmission and distribution operations.[62]
Similarly, the specific power to review rates for reasonableness, which chapter 35 explicitly gives the Commission, is distinct from the power to set rates in the first instance.[63] Although the Commission argues that we must read the phrase "relating to rates" to include the ability at least to set rates, citing Morales v. Trans World Airlines, Inc.,[64] and Continental Airlines, Inc. v. Kiefer,[65] these cases are inapposite for the reasons the court of appeals explained.[66]
Chapter 35 gives the Commission other express powers as well. The Commission is to ensure that all utilities provide nondiscriminatory access to transmission service.[67] The Commission may also require a utility to provide wholesale transmission service to another utility, and may determine whether the terms for the transmission service are reasonable.[68] And, when a utility provides transmission service at a third party's request, the Commission is to *320 ensure that the utility recovers its reasonable costs from the entity receiving the services so that the utility's customers don't bear those costs.[69] None of these powers and duties grants or necessarily requires the ability to initially set wholesale transmission rates.
An argument is made that, because the Commission may decide whether the terms of service are reasonable, it may determine in advance that, in every case, the postage-stamp method is the only reasonable one for setting rates. This argument does not comport with the limited authority that chapter 35 gives the Commission that we have just described. For if the Commission has the authority initially to set rates, then it could of course predetermine what rate is reasonable. Absent the authority to set rates, though, it is not at all certain that the Commission could set a blanket rate.
Finally, the Commission may require that parties to a dispute "concerning prices or terms of wholesale transmission service" engage in a nonbinding dispute resolution process before coming to the Commission to resolve the dispute.[70] But if all rates for wholesale transmission service are set up front, there will be no "dispute[s] concerning prices." The Commission's rules thereby render this part of the statute meaningless.[71] The Commission points out several pending cases in which utilities are challenging the outcome of individual contested-case hearings in which the Commission set their wholesale transmission rates, arguing that these cases show that disputes still exist that could be subject to ADR. The short answer to this contention is that these are not the disputes between utilities that the statute contemplates. Instead, by its plain language the statute anticipates disputes between individual utilities about the price for wholesale transmission service-which can't exist when the Commission has already said precisely what each utility must pay to each other utility for such service.
In sum, we agree with the court of appeals that chapter 35 envisions largely an oversight role for the Commission with respect to wholesale transmission transactions.[72] The statute contemplates that one utility will request transmission service from another utility. Should those parties not be able to agree on the terms for service, they can turn to the Commission. In that circumstance, the Commission can order one utility to provide service to another, can determine whether the terms for that service are reasonable, and can ensure that the utility providing service recovers its costs from the utility receiving service.[73] Once confronted with a dispute between utilities, the Commission can arrive at a reasonable rate to resolve that dispute. The Commission also has the option to refer parties to alternative dispute resolution to settle disputes over transmission service pricing.[74] Moreover, to ensure that utilities are providing comparable prices and services and non-discriminatory access, and to protect a utility's customers from bearing others' transmission costs, the Commission has the independent ability to order utilities to appear before it even without a dispute.[75] *321 But the Commission does not have the authority under chapter 35 to dictate by rule the rates that each utility must charge each other utility for wholesale transmission service.
The Commission further argues that minor changes made to chapter 35 in the codification process demonstrate that the Legislature approved its rules. In section 2.057(a) of PURA95 as originally enacted, the Commission was instructed to adopt rules relating to wholesale transmission service, rates, and access "within 180 days of the effective date of this section...."[76] When the statute was codified, the 180 day requirement was dropped. The Commission argues that this change indicates the Legislature's approval of its rules. It does not. Rather, it demonstrates no more than the fact that the Legislature was aware that the Commission had adopted rulesthat is, the deletion recognized the rules' existence; it did not comment on the rules' substance.
The Commission also points to the fact that section 2.057(a) commanded utilities to file their tariffs "within 60 days after the commission has adopted transmission pricing and access rules pursuant to this section...."[77] This language was also dropped in the codification. The Commission argues that the phrase "transmission pricing ... rules" recognizes its authority to set rates by rule. But this phrase will not bear the weight the Commission puts on it. A simple reference to "pricing rules," which refers back to previous language, cannot grant additional substantive powers.
Thus, we conclude that PURA95, as originally enacted and codified, did not give the Commission any authority to set wholesale transmission rates for municipally owned utilities, including San Antonio. But the Commission retains its existing authority to set wholesale transmission rates for investor-owned utilities, including HL & P, pursuant to chapter 36.

VIII. RESPONDENTS' CHALLENGE TO THE ACCESS FEE
Our conclusion that the Commission lacks authority under chapter 35 to set rates for San Antonio means we need not reach San Antonio's remaining issues. For its part, HL & P argues that, even if the Commission had the authority to set its wholesale transmission rates generally (which HL & P has conceded), the Commission exceeded that authority in creating the "access fee" portion of the facilities charge, because the access fee violates a variety of PURA95's requirements. The Commission contends that we should remand this issue to the court of appeals, which did not reach it. Because the Legislature has already amended the statute in ways which limit the relevance of this case to the 1996-1999 time period, there is nothing to be gained by a remand but further delay. We will therefore consider the issue.[78]
HL & P argues that the access fee is inconsistent with PURA95's provisions because it creates subsidies among utilities, and because it does not set rates for wholesale transmission service that are comparable with each utility's use of its own system. We agree that the access fee does not comport with the statute.

A. Costs and Service
The access fee is inconsistent with the statute because it requires payments without *322 regard to whether actual services are provided. The statute contemplates that one utility will request transmission service from another, and that the amount paid for that service will be based on the cost to provide it.[79] But the access fee is not related in any way to whether a utility actually uses another utility's transmission lines to transport wholesale power. Nor is it based on the cost of providing wholesale transmission service in any particular transaction, even though the Commission itself acknowledges that the distance power must travel is a significant factor in that cost.[80] Each utility pays each other utility the fee regardless of the proximity of transmission systems or any amount of actual use. Thus, one utility may pay an access fee to another utility even if it never uses the other's lines for a single transmissioneven if it has no wholesale transmissions at all. For example, the Commission's own impact fee calculations, done using the VAMM method, demonstrate that HL & P's transmission has no effect on the transmission lines of several utilities located far from Houston; yet, HL & P pays these utilities a percentage of their transmission costs based on HL & P's percentage of usage at ERCOT's peak.[81] The same is true for San Antonio.[82]
The end result of the access fee requirement is that some utilities pay out more for transmission service than they recover. Thus, as a practical matter, these utilities do not recover their transmission costs from the entities for whom wholesale transmission is provided, contravening the statute.[83] And to the extent they do recover their costs, it may be from utilities for whom they provided no service. What is more, this shortfall, the Commission itself has said, should be factored into the rates that retail customers pay for electric service.[84] Consequently, in direct violation of the statute's requirements, a utility's "other customers" bear the costs of wholesale transmission service.[85]
The Commission argues that the access fee is consistent with PURA95. First, it points out that in Rule 23.67(o), which has not been challenged, it required all utilities to make filings with the Commission separating out their component costs for generation, distribution and transmission operations.[86] Rule 23.67(o) further requires each utility to functionally "unbundle" certain operations.[87] The Commission argues that this unbundling means that a utility's functions as transmission customer and transmission provider are treated as belonging to completely separate companies, so that it is not surprising, and in fact doesn't matter, that a utility may pay more for service as a transmission customer than it receives for service as a transmission provider.
Second, the Commission argues that VAMM does not accurately measure the effects one utility's transmissions have on another utility's lines at all times. Rather, VAMM is a "snapshot" of usage at one *323 instant. Because of the nature of electricity, the Commission asserts, a utility's transmissions have overflow effects on other utilities' lines, even if those effects are unintended. Electricity, says the Commission, follows the path of least resistance and doesn't observe man-made boundaries. The access fee accounts for this inadvertent usage.
Third, the Commission insists that the access fee fosters wholesale competition because any utility in ERCOT can buy power from any other utility on the grid without having to factor in transmission costs. The access fee is constant regardless of the distance power must travel or how many wholesale transactions a utility conducts.
We are not persuaded by the Commission's arguments. With respect to unbundling, Rule 23.67(o) does not require the transmission-providing and transmission-consuming operations of a utility to be treated as separate companies. Rather, it is the transmission operations and the wholesale purchase and sale activities that are to be separated.[88] Moreover, the Commission fails to explain why both aspects of transmission would not be included in a utility's transmission operations, even if the other functions were unbundled. And in any event, since any unbundling is merely functional, the overall effect remains the same-a utility that pays out more than it takes in, as a whole, does not recover its transmission costs. And the Commission expects those costs to be passed on to other customers.
With respect to VAMM, certainly the Commission itself thought the method sufficient to measure one utility's effects on another for purposes of setting the impact fee. Indeed, in adopting the method, the Commission said:
The [VAMM] method measures all changes in the use of the transmission lines; it is more stable than the other variants of the megawatt-mile methodology; it will aid in accurate transmission pricing; and it sends the appropriate price signals to generators and loads.[89]
Moreover, in the Commission's own words, "while a utility such as HL & P may own transmission lines that connect all of its generators to its loads, the power produced by its generators may actually flow over both its own transmission lines and the transmission lines of neighboring utilities."[90] This does not explain why, for example, HL & P must pay an access fee to the Rio Grande Electric Cooperative, which is certainly not a "neighboring" utility. In any event, in PURA95 the Legislature did not direct the Commission to compensate utilities for occasional inadvertent power flows over their transmission systems.
Finally, although the access fee may encourage wholesale competition, that cannot make up for the fact that it violates the explicit command that the rules be consistent with PURA95's standards. As we noted earlier, an administrative agency may not exercise a new power, or one that is inconsistent with the agency's statutory mandate, simply because the agency perceives that power as expedient.[91]

B. Comparability
HL & P also argues that the access fee violates PURA95's mandate that the rates a utility charges for wholesale transmission *324 service be comparable to its own use of its system. The Commission maintains that the fee is consistent with the comparability requirement because each utility pays itself for transmission service at the same rate as others pay it for the same service. HL & P points out, however, that the rates set by the access fee are not comparable to the existing rates charged retail customers. Those rates are based on a utility's own invested capital and costs.[92] The access fee, on the other hand, is based on the aggregate of all uses and costs in the ERCOT grid. Thus, the access fee is not based on a utility's use of its own system, as the statute contemplates. Nor is it comparable to what a utility charges its retail customers for service. For these reasons, the access fee also violates section 35.004(a)'s comparability requirement.

C. Legislative Acceptance
Petitioner Texas-New Mexico Power Company offers an additional argument in support of the rules. It asserts that the Legislature accepted the Commission's construction of PURA95 when it codified the statute in 1997. But the doctrine of legislative acceptance applies when an agency interpretation of an ambiguous statute has been in effect for a long time and the Legislature re-enacts the statute without change.[93] That is not the case here. The Legislature did not re-enact PURA95, but rather codified it. And the Commission's interpretation of the statute at that time was new, and already subject to a court challenge in this case. Finally, in 1999 the Legislature did amend chapter 35.
In the 1999 amendments to chapter 35, the Legislature specified that the Commission:
shall price wholesale transmission services within ERCOT based on the postage stamp method of pricing under which a transmission-owning utility's rate is based on the ERCOT utilities' combined annual costs of transmission divided by the total demand placed on the combined transmission systems of all such transmission-owning utilities within a power region.[94]
Thus, the Legislature has now affirmatively told the Commission to price wholesale transmission services entirely by the postage stamp method previously used to set only the access fee.
The parties agree that, following this change, the Commission has the authority to set rates for both investor-owned and municipally owned utilities using the postage stamp method.[95] The Commission argues that the 1999 amendments simply clarified the authority it already had, while HL & P argues that they bestowed an entirely new power. For our purposes, subsequent statutory amendments are of limited usefulness. We must be guided by what the law was in the relevant time period1995. And PURA95 was not ambiguous with respect to the powers it gave the Commission.
The Commission also points out that, although the Legislature added the postage stamp provision, it did not change *325 those provisions of the statute with which we have found the Commission's rules to be inconsistent. The Commission suggests that this means the Legislature did not think there was any inconsistency. But the Legislature can, and does, choose to amend a statute without reconciling all inconsistencies. In fact, the Legislature has offered instructions for interpreting apparently irreconcilable amendments.[96] And this case does not require us to interpret chapter 35 as it currently appears.
Because we have determined that the access fee is inconsistent with the statute's command, we do not reach the further question of whether the rules are contrary to federal law. If, as the Commission argues, the access fee is consistent with orders from the FERC, that still cannot supply statutory authority that our own Legislature has not given. We express no opinion on the court of appeals' discussion of this point.
Finally, the Commission argues that, even if the access fee portions of the rules are invalid, the court of appeals erred in striking Rule 23.67(m) because that rule does nothing more than articulate the statutory requirement that all utilities file tariffs. But in fact the rule mandates that tariffs "shall comply with the provisions of this rule," many of which are invalid. Thus, because Rule 23.67(m) requires compliance with invalid portions of the rules, Rule 23.67(m) itself is invalid.

IX. CONCLUSION
Because the Commission exceeded its statutory authority in (1) establishing wholesale transmission rates for municipally owned utilities and (2) establishing the access fee, subsections(f), (g), (h), (i), (j) and (m) of Rule 23.67, and subsections (j) and (o) of Rule 23.70, are invalid. We therefore affirm the court of appeals' judgment.
Justice HECHT, filed a dissenting opinion.
Justice O'NEILL, did not participate in this decision.
Justice HECHT, dissenting.
I respectfully dissent.
In 1995, the Legislature enacted what is now chapter 35 of the Texas Utilities Code, directing the Public Utility Commission to "adopt rules ... relating to wholesale [electric] transmission service, rates, and access."[1] To comply with this mandate, the Commission adopted two rules,[2] the provisions of which at issue here required that load-serving ERCOT[3] utilities pay each other a "facilities charge" for transmission services. Seventy percent of that charge was an "access fee" calculated by multiplying a utility's percentage of ERCOT's peak load by ERCOT's total transmission costs. Because a utility's access fee was thus largely unrelated to its own transmission costs or the distance between utilities, the Commission referred to it as a "postage stamp" rate. In 1999, the Legislature amended chapter 35 to "price wholesale transmission services within ERCOT based on the postage stamp method" entirely, not just seventy percent. The *326 parties concede that this was within the Legislature's power. The dispute is over whether the Legislature gave the Commission authority to adopt the postage stamp method before the 1999 amendment.
The Court concludes that the Commission had no such authority for two reasons. First, the Court says that the access fee was a rate and the 1995 statute did not empower the Commission to adopt rates. The authority to "adopt rules relating to rates", the Court says, is not the authority to "adopt rates", contrasting the explicit "establish and regulate rates" language of chapter 36.[4] But when the statutory language is read in context, any distinctions disappear. For one thing, no one has yet offered an example of a rule that related to rates without to some extent prescribing rates. Even a rule that said nothing more than the statutethat rates must be reasonable[5]limits rates. If a mandate to "adopt rules relating to rates" does not authorize ratemaking, what exactly does it authorize? Neither the Court nor the parties have an answer. Moreover, the 1995 statute expressly authorized the Commission, as the Court acknowledges,[6] to "require an electric utility to provide transmission service at wholesale" and to "determine whether terms for the transmission service are reasonable."[7] Could the Commission say in every case, "No rate other than a postage stamp rate is reasonable"? Of course. Then what is the difference between deciding every case on the same rationale and restating that rationale as a rule? Obviously, there is none. The Court's eyes-wide-shut approach to reality reduces to this: the Commission could decide, case by case, that a reasonable rate must be based seventy percent on an access fee methodology, but it could not make its ratio decidendi a rule.
Second, the Court says that the Commission's rules conflict with three provisions of the statute. One is that "[t]he commission may require that each party to a dispute concerning prices or terms of wholesale transmission service engage in a nonbinding alternative dispute resolution process before seeking resolution of the dispute by the commission."[8] What price disputes are there to resolve, the Court asks, if rates are set by rule? One answer is that the Commission's determination of wholesale rates has required numerous proceedings involving each utility. These may be what the Legislature had in mind. The other two conflicting statutory provisions, according to the Court, are that wholesale transmission rates be "comparable to the rates and terms of the utility's own use of its system",[9] and that such rates "ensure that the utility recovers the utility's reasonable costs."[10] But the facilities charge prescribed by the Commission's rules is comparable enough to a utility's own system use as to be within the "zone of reasonableness" for setting rates,[11] and the charge does not deny a utility recovery of reasonable costs.
More importantly, however, by the 1999 amendment the Legislature required that transmission service rates be set entirelynot just seventy percentusing the postage stamp method without changing *327 any of the statutory provisions the Court finds to be conflicting. If a prescribed rate methodology conflicts with the availability of alternate dispute resolution, why did the Legislature leave the latter provision untouched when it amended the statute? If postage stamp rates violate chapter 35 because they subsidize less efficient utilities and are unrelated to a utility's costs, how was the Legislature able to prescribe such rates in chapter 35 without doing violence to its own statute? The Court has no answer.
The Court says that we must presume that the Legislature intended by its 1999 amendments to change the law. I do not see how we can possibly tell whether the Legislature intended a change, or a correction, or something else entirely. Neither the Court nor the parties have pointed to any legislative history that could provide an answer. What can be said with absolute certainty, however, is that the Legislature determined in 1999 that the Commission's postage stamp rate was consistent with the overall scheme of chapter 35 and the best way to achieve its purposes. In light of that determination, I do not understand how it is possible to conclude, as the Court does, that the exact same statute in 1995, minus the provision added in 1999, prohibited the Commission's postage stamp rate methodology.
I would reverse the judgment of the court of appeals and affirm the judgment of the district court upholding the Commission's rules.
NOTES
[1] See Tex. Util.Code § 35.002.
[2] Id. § 35.006(a).
[3] 9 S.W.3d 868, 877-78.
[4] See Tex.Rev.Civ. Stat. Ann. art. 1446c-0 §§ 2.056-2.057, codified at Tex. Util.Code §§ 35.001-.008. The Legislature again amended PURA in 1999. Cites in this opinion are to the pre 1999 version of the act unless otherwise noted.
[5] Tex.Rev.Civ. Stat. Ann. art. 1446c-0 § 2.056(a), codified at Tex. Util.Code § 35.005(a).
[6] Id. § 2.057(a), codified at Tex. Util.Code § 35.004(a).
[7] Id., codified at Tex. Util.Code § 35.004(b).
[8] Id. § 2.057(c), codified at Tex. Util.Code § 35.004(c).
[9] Id. § 2.057(a), codified at Tex. Util.Code § 35.006(a).
[10] Id.
[11] Tex.Rev.Civ. Stat. Ann. art. 1446c-0 § 2.057(a), codified at Tex. Util.Code § 35.007(a).
[12] Id. § 2.057(d), codified at Tex. Util.Code § 35.008.
[13] See 21 Tex. Reg. 1397 (1996), adopting 16 Tex. Admin. Code § 23.67 (Rule 23.67), and 21 Tex. Reg. 3343 (1996), adopting 16 Tex. Admin. Code § 23.70 (Rule 23.70). The rules have been recodified at 16 Tex. Admin. Code §§ 25.5, 25.191.198 and 25.200-.204. See 24 Tex. Reg. 2873 (1999). Subsequent amendments to the rules are not relevant to this dispute. References in this opinion are to the 1996 version of the rules.
[14] 16 Tex. Admin. Code § 23.67(g).
[15] Id. § 23.67(g)(1).
[16] See id. §§ 23.67(g)(6), 23.70(o).
[17] See 21 Tex. Reg. 1403.
[18] 16 Tex. Admin. Code § 23.67(g)(1).
[19] See id.
[20] 16 Tex. Admin. Code § 23.67(j)(1).
[21] See Tex. Pub. Util. Comm'n, Regional Transmission Proceeding to Establish Statewide Load Flow Pursuant to Subst. R. 23.67, Attachment D, Docket No. 15840 (final order)(August 11, 1997).
[22] 16 Tex. Admin. Code § 23.67(g)(1).
[23] Those parties, petitioners here alongside the Commission, are Brazos Electric Power Cooperative, Inc., City of Austin, Lower Colorado River Authority, Public Utilities Board of City of Brownsville, Rayburn Country Electric Cooperative, Tex La Electric Cooperative, Inc., East Texas Electric Cooperative, Inc., Houston County Electric Cooperative, Inc., Deep East Texas Electric Cooperative, Inc., Cherokee County Electric Cooperative Association, Texas New Mexico Power Company, and South Texas Electric Cooperative, Inc. Petitioners are referred to collectively as "the Commission."
[24] 9 S.W.3d 868, 877-78.
[25] 133 Tex. 330, 128 S.W.2d 9 (1939).
[26] 9 S.W.3d at 874 (citing Humble Oil, 128 S.W.2d at 15).
[27] Public Util. Comm'n v. GTE-Southwest, Inc., 901 S.W.2d 401, 407 (Tex.1995); see also State v. Public Util. Comm'n, 883 S.W.2d 190, 194 (Tex.1994).
[28] GTE-Southwest, 901 S.W.2d at 407 (quoting Kawasaki Motors v. Motor Vehicle Comm'n, 855 S.W.2d 792, 797 (Tex.App.-Austin 1993, no writ)).
[29] See Railroad Comm'n v. Lone Star Gas Co., 844 S.W.2d 679, 686-87 (Tex.1992); Railroad Comm'n v. City of Austin, 524 S.W.2d 262, 267 (Tex.1975); Key Western Life Ins. Co. v. State Bd. of Ins., 163 Tex. 11, 350 S.W.2d 839, 848 (1961); Board of Ins. Comm'rs v. Guardian Life Ins. Co. of Tex., 142 Tex. 630, 180 S.W.2d 906, 908 (1944).
[30] GTE-Southwest, 901 S.W.2d at 406; see also Public Util. Comm'n, 883 S.W.2d at 194.
[31] See GTE-Southwest, 901 S.W.2d at 407; Public Util. Comm'n, 883 S.W.2d at 194.
[32] GTE-Southwest, 901 S.W.2d at 407 (quoting Kawasaki Motors v. Motor Vehicle Comm'n, 855 S.W.2d 792, 797 (Tex.App.-Austin 1993, no writ)).
[33] Id. (quoting Sexton v. Mount Olivet Cemetery Ass'n, 720 S.W.2d 129, 137-38 (Tex. App.Austin 1986, writ ref'd n.r.e.)).
[34] Tarrant Appraisal Dist. v. Moore, 845 S.W.2d 820, 823 (Tex.1993).
[35] See 16 Tex. Admin. Code § 23.67(g)(1), (m).
[36] Tex. Util.Code § 31.002(6), formerly Tex. Rev.Civ. Stat. Ann. art. 1446c-0 § 2.0011(6).
[37] 16 Tex. Admin. Code § 23.67(g).
[38] Tex. Util.Code § 31.002(6).
[39] Id. § 36.001(a).
[40] Id. § 31.002(6); see supra Section VI.
[41] Id. § 11.003(18) (emphasis added).
[42] Tex. Util.Code § 36.002.
[43] Id. § 36.051 (emphasis added).
[44] Id. § 36.003(a).
[45] Id. § 36.003(b).
[46] Id. § 36.051.
[47] Id. §§ 36.052-36.053.
[48] Id. § 36.052(3).
[49] See, e.g., id. §§ 36.054-.064.
[50] See 9 S.W.3d at 874.
[51] Id. § 31.002(1).
[52] Id. § 32.002.
[53] See, e.g., id. §§ 33.002(a)-(b), 33.051, 33.052, 33.054.
[54] Id. § 35.001.
[55] See GTE-Southwest, 901 S.W.2d at 407.
[56] Tex. Util.Code § 36.001(a).
[57] Id. § 35.001.
[58] Id. § 35.006(a).
[59] See Commercial Standard Ins. Co. v. Bd. of Ins. Comm'rs, 34 S.W.2d 343, 344 (Tex.App.-Austin 1930, writ ref'd).
[60] 16 Tex. Admin. Code § 23.67(d).
[61] Id. § 23.67(e).
[62] Id. § 23.67(o).
[63] See State v. Southwestern Bell Tel. Co., 526 S.W.2d 526, 529-30 (Tex.1975).
[64] 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992).
[65] 920 S.W.2d 274, 278-79 (Tex.1996).
[66] 9 S.W.3d at 876-77.
[67] Tex. Util.Code § 35.004(b).
[68] Id. § 35.005(a).
[69] Id. § 35.004(c).
[70] Id. § 35.008.
[71] See Tex. Gov't Code § 311.021(2); Cameron v. Terrell & Garrett, Inc., 618 S.W.2d 535, 540 (Tex.1981).
[72] See 9 S.W.3d at 874-75.
[73] Tex. Util.Code §§ 35.004(c), 35.005(a).
[74] Id. § 35.008.
[75] See id. § 35.004(a)-(c).
[76] Tex.Rev.Civ. Stat. Ann. art. 1446c-0 § 2.057(a).
[77] Id.
[78] See Tex.R.App. P. 53.4.
[79] See Tex. Util.Code § 35.004(a).
[80] See 21 Tex. Reg. 1404.
[81] See Tex. Pub. Util. Comm'n, Regional Transmission Proceeding to Establish Statewide Load Flow Pursuant to Subst. R. 23.67, Attachment D, Docket No. 15840 (final order)(August 11, 1997), compare "Postage Stamp Component of TCOS" with "Summary of Megawatt Mile Impact."
[82] See id.
[83] Tex. Util.Code § 35.004(c).
[84] See 21 Tex. Reg. 1403.
[85] Tex. Util.Code § 35.004(c).
[86] 16 Tex. Admin. Code § 23.67(o).
[87] Id. § 23.67(o)(1).
[88] Id.; see also 21 Tex. Reg. 1410.
[89] 21 Tex. Reg. 1403 (emphasis added).
[90] Id. at 1404 (emphasis added).
[91] GTE-Southwest, 901 S.W.2d at 407.
[92] See Tex. Util.Code §§ 36.051, 36.053.
[93] See Sharp v. House of Lloyd, Inc., 815 S.W.2d 245, 248 (Tex.1991).
[94] Tex. Util.Code § 35.004(d), amended by Acts 1999, 76th Leg., ch. 405, § 17.
[95] See also Tex. Util.Code §§ 40.004(1), 40.055(a)(1), added by Acts 1999, 76th Leg., ch. 405, § 39.
[96] See Tex. Gov't Code § 312.014.
[1] Public Utility Regulatory Act of 1995, 74th Leg., R.S., ch. 765, § 2.08, 1995 Tex. Gen. Laws 3972, 4000, codified as Tex. Util.Code §§ 35.001-.008. All statutory references are to the Texas Utilities Code.
[2] Rule 23.67, 21 Tex. Reg. 1397, amended by 21 Tex. Reg. 8500 (1996), and Rule 23.70, 21 Tex. Reg. 3343 (1996), formerly codified as 16 Tex. Admin. Code §§ 23.67 and 23.70, and both repealed by 24 Tex. Reg. 2873 (1999).
[3] Electric Reliability Council of Texas.
[4] Tex. Util.Code § 36.001(a).
[5] Tex. Util.Code § 35.005(a).
[6] Ante at 322.
[7] Tex. Util.Code § 35.005(a).
[8] Id. § 35.008.
[9] Id. § 35.004(a).
[10] Id. § 35.004(c).
[11] See City of Corpus Christi v. Public Utility Comm'n, 51 S.W.3d 231, 246 (Tex.2001).