IN THE SUPREME COURT OF TEXAS








IN THE SUPREME COURT OF TEXAS
 
════════════
No. 06-0904
════════════
 
Guitar Holding Company, 
L.P., Petitioner,
 
v.
 
Hudspeth County Underground 
Water
Conservation District No. 1, 
et al., Respondents
 
════════════════════════════════════════════════════
On Petition for Review from the
Court of Appeals for the Eighth District of 
Texas
════════════════════════════════════════════════════
 
 
Argued December 5, 
2007
 
 
            
Justice Medina delivered 
the opinion of the Court.
 
            
The Texas Water Code generally delegates the management and control of 
groundwater production and use to local groundwater conservation districts, 
vesting them with broad regulatory powers. Tex. Water Code §§ 36.001-.304. When 
exercising these powers to limit groundwater production, local districts may 
protect existing wells and production by continuing “historic or existing use” 
to the extent possible under its comprehensive management plan. Id. § 36.116(b). 
The scope of this “historic or existing use” exemption and the extent to which a 
district’s rules may operate to preserve such use are at issue in this 
appeal.
            
The underlying rules here grandfather “historic or existing use” of 
groundwater in the district to an amount of water previously used during the 
relevant historic period without regard to the intended future purpose for that 
water. Thus, under the district rules, production from a grandfathered well, 
historically used to irrigate crops, can in the future be sold for transport out 
of the district as a preserved historic or existing use. The court of appeals 
upheld the district’s permitting scheme, concluding, in effect, that the 
district’s authority to preserve the “historic or existing use” of groundwater 
pertained only to the amount of water used in the past and not its purpose. 209 
S.W.3d 146, 158-59. We conclude, however, that the amount of groundwater used 
and its beneficial purpose are components of “historic or existing use” and that 
the district thus exceeded its rule-making authority in grandfathering existing 
wells without regard for both. Accordingly, we reverse the court of appeals’ 
judgment and render judgment, declaring the district’s scheme for issuing 
permits for the transfer of groundwater out of the district invalid.
I
            
Groundwater conservation districts are “the state’s preferred method of 
groundwater management.” Tex. Water 
Code § 36.0015. Chapter 36 of the Texas Water Code grants these districts 
broad authority to manage, conserve, and protect groundwater resources through 
rule-making[1] and permitting.[2] Id. §§ 36.101(a), 36.113(a). 
Under this chapter, each groundwater conservation district is required to 
develop a comprehensive management plan with stated goals, such as, promoting 
the most efficient use of groundwater, preventing waste and subsidence, and 
addressing conjunctive surface water management issues, natural resource issues, 
drought conditions, and conservation. Id. § 36.1071(a)(1)-(7).
            
When adopting its plan, the district must consider all groundwater uses 
and needs to develop rules that are fair and impartial. Id. § 
36.101(a). Part of the plan must include a permitting system “for the drilling, 
equipping, operating, or completing of wells or for substantially altering the 
size of wells or well pumps.” Id. § 36.113(a). A district may also 
regulate well spacing and water production. Id. § 36.116(a)(1)-(2). When regulating 
production, a district may consider: setting production limits; limiting the 
amount of water produced based on acreage or tract size; limiting the amount of 
water produced from a defined number of acres assigned to an authorized well 
site; limiting the maximum amount of water produced on the basis of acre-feet 
per acre or gallons per minute per well site per acre; managed depletion, or a 
combination of any of those. Id. § 36.116(a)(2)(A)-(F). When 
promulgating rules that limit groundwater production, a district may preserve 
historic or existing uses of groundwater in the district to the maximum extent 
practicable consistent with its comprehensive management plan. Id. § 36.116(b). 
Finally, the district must develop its plan using the best available data and 
must forward its plan to the regional water planning group for consideration in 
its planning process. Id. § 36.1071(b). The district’s plan 
must also be certified by the Texas Water Development Board. Id. § 
36.1072(d).
            
            
            
            
            
            
            
            
           A
            
The Hudspeth County Underground Water Conservation District No. 1 is 
situated in northeast Hudspeth County, at the western foot of the Guadalupe 
Mountains less than a hundred miles east of El Paso. This is an arid part of the 
state, averaging only eight to ten inches of rain annually. The Hudspeth 
District, however, includes the Bone Springs-Victorio Peak Aquifer and the 
fertile Dell 
Valley where there has been 
irrigation for over fifty years. Although one of the state’s earliest 
conservation districts, having been created in response to the historic state 
drought of the 1950s, the District’s management of the aquifer has not been a 
success. In fact, by mid-2000, the state auditor[3] deemed the District non-operational, 
questioning whether it was appropriately managing its groundwater.
            
In response, the District brought in an expert consultant to help bring 
its management plan into compliance and return to operational status. During 
this time, the City of El 
Paso targeted the area as a potential source of water for 
its growing demand. The Legislature was also active, amending the Water Code to 
facilitate the transfer of groundwater to places in need, such as growing 
metropolitan areas.[4] After the Seventy-seventh Legislature 
adjourned in 2001, the reconstituted Hudspeth District Board met to adopt a new 
management plan and new rules.
            
Under its new management plan, the District committed itself to 
sustaining the Bone Springs-Victorio Peak Aquifer at an historically optimal 
level by regulating the withdrawal of groundwater. Groundwater production was 
divided among three core classes of users: (1) statutorily exempt users, (2) 
existing and historic users, and (3) new users, which also might include 
historic users seeking to increase consumption. The right to produce groundwater 
from completed, non-exempt wells was linked directly to the aquifer’s level, 
although groundwater production limitations were to operate differently 
depending on the type of permit held by the well owner.
            
The District adopted the current rules on May 31, 2002. These rules 
recognize three types of permits: (1) validation permits, (2) operating permits, 
and (3) transfer permits. Wells operating before the adoption of the District’s 
new rules are generally entitled to validation permits. If a well is not 
eligible for a validation permit, the landowner may apply for an operating 
permit. Finally, transfer permits must be obtained to transfer water out of the 
district. A validation or operating permit is required to obtain a transfer 
permit.
            
Landowners who qualify for validation permits are entitled to withdraw 
from three to four acre-feet per year, depending on the aquifer’s elevation, for 
every acre irrigated during a designated historic and existing use period. The 
District’s rules define this period to be ten-and-a-half years, beginning 
January 1, 1992, and ending May 31, 2002. Landowners with validation permits who 
did not irrigate during the historic use period are entitled to produce the 
maximum amount of water beneficially used in any one year during the period. An 
operating permit, on the other hand, entitles a landowner to produce water from 
a new well based upon surface acreage. The production right under an operating 
permit is further conditioned upon the elevation of the Bone Springs-Victorio 
Peak Aquifer. Thus, unlike the holder of a validation permit whose production 
rights are guaranteed, the holder of an operating permit has no right to 
groundwater until the aquifer reaches a designated average water level.
            
Transfer permits are available to any holder of either a validation or 
operating permit. Validation permit holders, however, particularly those held by 
landowners who irrigated during the historic use period, receive substantially 
greater transfer rights under the rules than other landowners because they 
receive substantially greater guaranteed allocations of groundwater than other 
landowners. By contrast, landowners who hold operating permits receive no 
guaranteed allocation and thus may not have any right to transfer water when the 
aquifer fails to reach the designated elevation.[5]
            
            
            
            
            
            
            
            
           B
            
Guitar Holding Company, one of the largest landowners in Hudspeth County, irrigated only a small portion of 
its land during the designated historic and existing use period. It has obtained 
validation permits for fifteen existing wells and has made application to drill 
fifty-two new wells. Cimarron Agriculture Ltd., CL Machinery Company, RBB Farms, 
and Triple B Farms have also received validation permits from the District. 
Because these Hudspeth County landowners irrigated their land 
during the historic and existing use period, they are permitted to produce a 
significantly greater amount of water than Guitar, even though Guitar owns more 
land. Further, because the District links transfer permits to validation and 
operating permits, landowners with validation permits, particularly those with 
grandfathered irrigation rights, can transfer these greater amounts of water out 
of the district.
            
In four separate administrative appeals to the Hudspeth County District 
Court, Guitar challenged the facial validity of the District’s new rules 
regarding production and transfer permits and raised as-applied challenges to 
the validity of permits issued to Cimarron Agriculture, CL Machinery, RBB Farms, 
and Triple B Farms. The district court upheld the validity of the District’s 
rules and issued permits, and the court of appeals affirmed those rulings. 209 
S.W.3d at 161. Guitar appeals, complaining the District has misapplied its 
limited authority to preserve existing or historic groundwater use within the 
district and in effect granted certain irrigators a perpetual franchise to 
transfer and sell Hudspeth County groundwater. 
            
            
            
            
            
            
            
            
           II
            
Guitar complains that this franchise has been accomplished by the 
District linking transfer permits to validation permits that preserve the 
historic or existing use of groundwater within the district. Guitar argues the 
Water Code only authorizes a district to preserve historic or existing use of 
the same type or purpose. Because transferring water out of the district is a 
new use, it cannot be preserved or “grandfathered” under section 36.116(b), 
which extends only to the preservation of an existing or historic use.
            
The District, on the other hand, argues that the provision granting it 
authority to preserve historic or existing use makes sense only if “use” refers 
to an amount of groundwater, not its purpose. Section 36.116(b) provides:
 
In 
promulgating any rules limiting groundwater production, the district may 
preserve historic or existing use before the effective date of the rules to the 
maximum extent practicable consistent with the district’s comprehensive 
management plan under Section 36.1071 and as provided by Section 36.113.
 
 
Tex. Water Code § 36.116(b). The 
District submits that the provision does not address the purposes to which the 
production is applied but rather implies a quantity by telling districts that 
they may “preserve historic or existing use . . . to the maximum extent 
practicable consistent with the district’s comprehensive management 
plan.” Id. From this dispute, it is apparent 
that the meaning of the word “use” is key to understanding a groundwater 
conservation district’s authority to “preserve historic or existing use” through 
rule-making under section 36.116. Id. 
            
Chapter 36 of the Water Code does not expressly define “use” or “historic 
or existing use.” Terms that are not otherwise defined are typically given their 
ordinary meaning. Tex. Dep’t of Transp. v. Needham, 82 S.W.3d 314, 318 
(Tex. 2002); 
see Tex. Gov’t Code § 
311.011. But undefined terms are also not construed “in isolation from the rest 
of the statute.” Cities of Austin, Dallas, Ft. 
Worth, and Hereford v. Sw. Bell Tel. Co., 92 S.W.3d 434, 442 
(Tex. 2002). 
They are instead to be read in harmony with other provisions of the statute. 
McIntyre v. Ramirez, 109 S.W.3d 741, 745 (Tex. 2003).
            
The noun “use” ordinarily conveys something with a purpose, an object, or 
an end.[6] This meaning is confirmed elsewhere in 
the chapter when the term is combined with a type or purpose. For example, 
Chapter 36 defines the terms “use for a beneficial purpose,” “agricultural use,” 
and “conjunctive use.” Tex. Water Code 
§ 36.001(9), (20), (21). An amendment to the chapter, after the adoption 
of the present local rules, however, indicates that the Legislature intended for 
the phrase “historic or existing use” to have a slightly broader meaning.
            
In 2005, the Legislature added a new definition for “evidence of historic 
or existing use,” which it defined as “evidence that is material and relevant to 
a determination of the amount of groundwater beneficially used” during the 
relevant time period. Id. § 36.001(29). The chapter 
already defined “use for a beneficial purpose” with a list of specific purposes 
and “any other purpose that is useful and beneficial to the user.” Id. § 36.001(9). 
Read together, these definitions indicate that the amount of groundwater 
withdrawn and its purpose are both relevant when identifying an existing or 
historic use to be preserved. Indeed, in the context of regulating the 
production of groundwater while preserving an existing use, it is difficult to 
reconcile how the two might be separated. See id. § 36.0015 (purpose of 
groundwater conservation districts is to conserve, preserve, and protect 
groundwater through regulation).
            
Apparently, that is the Legislature’s view about groundwater permits as 
well. Both amount and purpose are listed in Chapter 36 as recommended elements 
for all well permits. See id. § 36.1131(a). In addition to well 
ownership, location, and completion date, the chapter expressly addresses both 
the “purpose for which the well is to be used” and the “conditions and 
restrictions . . . on the rate and amount of withdrawal.” Id. § 
36.1131(a)(4), (8). Similarly, the District’s current rules require that all 
applications for permits include “a statement of the nature and purpose of the 
proposed use and the amount of water to be used for each purpose.” Hudspeth 
County Underground Water Conservation District No. 1 Rule 6.4(c)(3) (adopted May 
31, 2002). Thus, both the amount of water to be used and its purpose are normal 
terms of a groundwater production permit and are likewise a part of any permit 
intended to “preserve historic or existing use.” A district’s discretion to 
preserve historic or existing use is accordingly tied both to the amount and 
purpose of the prior use.
            
            
            
            
            
            
            
            
          III
            
In a related dispute, the parties disagree about whether the transfer 
permits issued by the District are from new permit applications. Classification 
as a new permit application is significant because a district may impose more 
restrictive conditions on new permit applications under certain circumstances. 
Those circumstances are set out in section 36.113(e), which provides that more 
restrictive permit conditions may be imposed on new applications when the 
limitations (1) are applied uniformly to all subsequent new permit applications, 
(2) bear a reasonable relationship to the existing district management plan, and 
(3) are reasonably necessary to protect existing use. Tex. Water Code § 36.113(e)(1)-(3).
            
Guitar argues that transferring groundwater out of the district is a new 
use for which a new application must be made, and that as a new permit 
application, the District must comply with the requirements of section 
36.113(e). Guitar submits, however, that by using its rules to link transfer 
permits to existing permits, either validation or operating, the District has 
avoided applying the same limitations to all of the new transfer permit 
applications. Guitar further submits that the District has thereby granted 
certain farmers, who irrigated their land in the past, a preferential right to 
convert their existing irrigation wells to an entirely new use without 
satisfying more restrictive conditions applied to other landowners. Guitar 
concludes that the District has exceeded its authority by granting preferential 
transfer rights to some in-district users who no longer seek to preserve their 
historic or existing use.
            
The District responds that its permitting scheme complies fully with 
section 36.122, the provision generally applicable to groundwater transfers out 
of district. That section provides that “a district may not impose more 
restrictive permit conditions on transporters than the district imposes on 
existing in-district users.” Tex. Water 
Code § 36.122(c). An exception is recognized for new permit applications 
which, as already mentioned, can include additional limitations if uniformly 
applied and necessary to protect existing use. See id. §§ 36.122(c), 
36.113(e). 
            
The District submits that by linking transfer permits to existing permits 
it has strictly adhered to the statutory directive by treating in-district users 
and transporters identically. Under its rules, any permittee, who has the right 
to produce groundwater in the district under either a validation permit for 
existing use or an operating permit for new use, is entitled to obtain a 
transfer permit. Thus, the District concludes that because it has not tried to 
impose more restrictive permit conditions on transporters than on in-district 
users, section 36.113(e) does not apply.
            
We agree with Guitar, however, that the transfer permits here are from 
new permit applications. No landowner in the Hudspeth District has ever 
transferred water outside the district or obtained a permit to do so before the 
adoption of these rules. Because a landowner must have a transfer permit to 
transfer water outside the district, all of the transfer permit applications 
here are new within the meaning of section 36.113(e).
            
            
            
            
            
            
            
            
          IV 
            
Generally, a groundwater district’s rules and decisions are reviewed 
under the substantial evidence rule. See id. § 36.253. The review is de 
novo, however, when, as here, an action is challenged on the ground that the 
groundwater district has acted beyond its statutory authority. See In re 
Entergy Corp. 142 S.W.3d 316, 322 (Tex. 2004); see also Pub. Util. Comm’n 
of Tex. v. City Pub. Serv. Bd. of San Antonio, 53 S.W.3d 310, 316 (Tex. 
2001). Chapter 36 authorizes a groundwater district to establish different rules 
and limits for historic or existing use, in effect, grandfathering landowners’ 
historic use to protect their existing investments and activities. Tex. Water Code § 36.116(b). The 
chapter, however, also requires that all new uses be treated equally, directing 
that limitations may be imposed on new permit applications, but only when done 
uniformly and when reasonably necessary to preserve existing use. Id. § 
36.113(e).
            
Although there is existing irrigation use in the district, the transfer 
rules do not protect that existing use. Instead, the transfer rules permit 
in-district irrigators to convert their protected existing use to an entirely 
new use, that is, to transfer it out of the district for municipal and 
industrial purposes. Once the groundwater allocated for existing irrigation use 
is transferred outside the district, however, the protected existing use ends, 
as does the justification for protecting that use. Rather than protect historic 
or existing use then, the District’s transfer rules, in essence, grant 
franchises to some landowners to export water while denying that right to 
others. Because the limitations are not uniformly applied to these new 
applications and are not necessary to protect existing use, the District’s 
transfer rules exceed the statutory authorization and are thus invalid.
            
            
            
            
            
            
            
            
        * * *
            
Accordingly, we reverse the court of appeals’ judgment and render 
judgment declaring the rules relating to transfer permits in Hudspeth County 
Groundwater Conservation District No. 1 invalid, as are the transfer permits 
issued pursuant thereto.
 
            
____________________________________
            
David M. Medina
            
Justice
 
 
Opinion 
delivered:         May 30, 2008
 






[1] 
Through rules, a groundwater conservation district may limit groundwater 
production based on tract size or well spacing, provide for the conservation, 
preservation, protection, and recharge of groundwater to control subsidence, 
prevent degradation of water quality, or prevent the waste of groundwater. Tex. Water Code § 36.101(a).

[2] 
The Water Code requires permits for most wells, although exception is made for 
certain exempt wells, which generally include wells used for domestic purposes, 
livestock, and oil and gas production. Tex. Water Code § 36.117(b)(1). 


[3] 
“A district is subject to review by the state auditor under the direction of the 
legislative audit committee pursuant to Chapter 321, Government Code.” Tex. Water Code § 36.302(a).

[4] 
On May 27, 2001, the Legislature enacted Senate Bill 2, which, among other 
things, amended Chapter 36 to prohibit groundwater districts from imposing more 
restrictive conditions on persons seeking permits to transport water out of a 
district than on existing in-district users, except in limited circumstances. 
Act of May 27, 2001, 77th Leg., R.S., ch. 966, §§ 2.49, 2.52, 2001 Tex. Gen. 
Laws 1991, 2015, 2018 (codified as amended at Tex. Water Code §§ 36.113(e), 
36.122(c)).

[5] 
The following table depicts the water allocations that holders of validation and 
operating permits receive under Hudspeth County Underground Water Conservation 
District No. 1 Rule 3.5(c):
 

 
 
 
 Average Water 
 Elevation
 
 Validation Permit 
 Allocation
 
 Operating Permit 
 Allocation
 
 
 Greater than 3,580 
 feet
 
 4.0 acre-feet per acre per 
 year
 
 Pro-rata up to 4.0 acre-feet 
 per acre per year
 
 
 Greater than 3,570 feet but 
 less than or equal to 3,580 feet
 
 4.0 acre-feet per acre per 
 year
 
  
  
 None
 
 
 Equal to or greater than 3,565 
 feet but less than or equal to 3,570 feet
 
 Pro-rata between 3.0 and 4.0 
 acre-feet per acre per year
 
  
  
  
 None
 
 Less than 3,560 
 feet
 
 For irrigation, 3.0 acre-feet 
 per acre per year; pro-rata for all other uses
 
  
  
 None
 

[6] 
See The New Shorter Oxford 
English Dictionary on Historical Principles 3531 (4th ed. 1993) (defining 
“use” to mean, among other things, “application or conversion to some purpose,” 
“manner or mode of using, employing, or utilizing something,” and “a purpose, an 
object, an end”); see also The 
American Heritage College Dictionary 1486 (3d ed. 2000) (“To put into 
service or apply for a purpose; employ”); Black’s Law Dictionary 1540 (7th ed. 
1999) (“The application or employment of something; esp., a long-continued 
possession and employment of a thing for the purpose for which it is adapted . . 
. .”); Webster’s New Collegiate 
Dictionary 1279 (1981) (“the act or practice of employing 
something”).