# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-02-00644-CV
NO. 03-02-00701-CV

**Texas Municipal Power Agency; City of Denton, Texas; City of Garland, Texas; and City of Greenville, Texas, Appellants**

**v.**

**Public Utility Commission of Texas and City of Bryan, Texas, Appellees**

**&**

**Texas Municipal Power Agency; City of Denton; City of Garland; and GEUS f/k/a Greenville Electric Utility System, Appellants**

**v.**

**Public Utility Commission of Texas; City of Bryan; and City of Weatherford, Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT NOS. 99-11127 & 99-14787, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING**

## O P I N I O N

In this combined appeal, we must decide whether appellee the Public Utility Commission of Texas had jurisdiction to determine whether the terms on which appellant Texas Municipal Power Agency ("TMPA") allocated wholesale costs for transmission of electricity to appellee City of Bryan, Texas ("Bryan") were reasonable. Bryan and appellants, City of Denton,

Texas; City of Garland, Texas; and GEUS f/k/a Greenville Electric Utility System (collectively, "Northern Cities"), are the four member cities of TMPA, an entity created to provide electricity to these cities.

In three issues, TMPA, joined by the Northern Cities, contends that the Commission was without jurisdiction to make any determination about wholesale transmission costs because in so doing it impermissibly altered the terms of TMPA's contract with Bryan.[1] TMPA further asserts that the district court erred in dismissing its request for declaratory relief that the Commission lacked jurisdiction over this dispute. For the reasons set forth below, we affirm the judgments of the district court.

## BACKGROUND

### *Early Wholesale Transmission Rate Proceedings*

A discussion of the history leading to the Commission proceedings at issue will be helpful in putting TMPA's arguments in context. In 1995, the legislature enacted the Public Utility Regulatory Act ("PURA95") to promote competition in the wholesale electricity market. *Public Util. Comm'n v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 312 (Tex. 2001) [hereinafter "*San Antonio*"]. The electric industry has three principal components: generation, transmission, and distribution of power. PURA95 required the Commission to adopt rules "relating to wholesale

---

[1] These causes of action originally included a contract dispute between TMPA and Bryan, which the district court severed. The contract dispute was transferred to and is pending in Grimes County, the site of TMPA's Gibbons Creek plant, which generates electricity for all of TMPA's member cities.

transmission service, rates, and access."[2]  The Commission in turn adopted rules governing wholesale transmission.  *See* 21 Tex. Reg. 1397 (1996) (adopting 16 Tex. Admin. Code § 23.67) [hereinafter rule 23.67], and 21 Tex. Reg. 3343 (1996) (adopting 16 Tex. Admin. Code § 23.70) [hereinafter rule 23.70].  These rules required each ERCOT[3] utility to pay every other ERCOT utility a "facilities charge" for transmission service.

The Commission then established matrices setting the net charges each utility would pay other ERCOT utilities for providing wholesale transmission service in 1997 and 1998.  *See* Tex. Pub. Util. Comm'n, *Regional Transmission Proceeding to Establish Postage Stamp Rate and Statewide Loadflow Pursuant to Substantive Rule 23.67*, Docket No. 15840 (Aug. 11, 1997) (final order establishing rates) [hereinafter "1997 rate-setting proceeding"]; Tex. Pub. Util. Comm'n, *Proceeding to Modify ERCOT Transmission Rates for 1998 Pursuant to Substantive Rule 23.67*, Docket No. 18459 (June 26, 1998) (final order establishing rates) [hereinafter "1998 rate-setting proceeding"].  A Travis County district court reviewed these orders, and, in the interim, the Texas Supreme Court invalidated portions of rule 23.67 on the ground that chapter 35 of PURA gave the Commission only an oversight role over a municipally owned utility's wholesale transmission rates, not the authority to dictate the rates by rule.  *San Antonio*, 53 S.W.3d at 320-21.  Because of the

---

[2]  Act of June 16, 1995, 74th Leg., R.S., ch. 765, § 2.08, 1995 Tex. Gen. Laws 3972, 4000 (amended 1997) (current version at Tex. Util. Code Ann. § 35.006(a) (West 1998)).

[3]  Texas utilities have voluntarily interconnected their regional transmission networks to form a single grid maintained by the Electric Reliability Council of Texas ("ERCOT").  When power within the ERCOT region is sold in a wholesale transaction, it is transported over this power grid. *See Public Util. Comm'n v. City Pub. Serv. Bd.*, 109 S.W.3d 130, 131 (Tex. App.—Austin 2003, no pet.).

supreme court's disposition, the district court in October and November 2003 reversed and remanded these orders to the Commission for further proceedings.

**Bryan's 1998 Complaint Against TMPA**

In 1976, TMPA entered into four identical power sales contracts to sell power at wholesale prices to Bryan and the Northern Cities. TMPA is a municipally owned utility, which is defined as "owned, operated, and controlled by a municipality or by a nonprofit corporation the directors of which are appointed by one or more municipalities." Tex. Util. Code Ann. § 11.003(11) (West 1998) [hereinafter "PURA § ____"]. Its board of directors is composed of two representatives from each of the member cities. Each city is also a municipally owned utility and a TMPA customer by contract. Under the contracts, TMPA provides electricity to each of the cities at designated points of delivery.

TMPA's transmission of electricity to the Northern Cities involved both TMPA lines and the lines of another utility, whereas transmission of electricity to Bryan involved only TMPA lines. The Commission's 1997 and 1998 wholesale transmission rate orders caused the Northern Cities to bear greater costs for transmission than they had before. A majority of the TMPA board of directors, outvoting Bryan six to two, passed a resolution requiring TMPA to reimburse the Northern Cities for a certain amount of the transmission charges that they bore under the Commission's orders. This led to an increase in TMPA's budget and in turn a reallocation of TMPA's charges to all of the member cities.

In July 1998, Bryan filed a complaint with the Commission against TMPA, alleging that the board's actions required it to pay a portion of the Northern Cities' transmission costs,

4

causing it to pay more for transmission service than the Commission's transmission orders required. Bryan argued that under the 1997 rate-setting proceeding, each city could "nominate" its own load for power supplied by TMPA, that is, specify how much wholesale transmission service it would need to provide power to its customers. In this way, Bryan contended, the cities treated their contracts with TMPA as "unbundled," meaning that TMPA charged them separately for generation, transmission, and distribution of electricity.

Bryan, concerned that the board might attempt to "rebundle" the contracts, sought a declaration that it could continue to nominate its own load for power supplied by TMPA and that, if it chose to do so, it would not be treated as a bundled wholesale customer of TMPA. TMPA responded that it, not the member cities, bore all costs of transmission under the power sales contracts. TMPA further argued that the Commission lacked the authority to unbundle the rate that it charged the cities, because the contracts required a bundled rate.

The Commission decided in Bryan's favor that Bryan was authorized to nominate its own load and was obligated to pay only those transmission charges established by the Commission. *See* Tex. Pub. Util. Comm'n, *Complaint of the City of Bryan, Texas Against Texas Municipal Power Agency and the Cities of Denton, Garland and Greenville, Texas*, Docket No. 19585 (Jul. 9, 1999) (final order) [hereinafter "Bryan's complaint proceeding"]. TMPA sought judicial review of the order in a Travis County district court. The district court reversed and remanded the proceedings to the Commission, due in part to the holding in the *San Antonio* case in 2001 invalidating the Commission's authority to set the wholesale transmission rates of municipally owned utilities. The

5

district court's disposition of Bryan's complaint proceeding is the subject of this appeal in cause number 03-02-00644-CV.

### *1999 Wholesale Transmission Rate Proceeding*

In October 1999, the Commission established a matrix of wholesale transmission charges for 1999. Pub. Util. Comm'n, *Proceeding to Modify ERCOT Transmission Rates for 1999 Pursuant to Substantive Rule 23.67*, Docket No. 20381 (Oct. 13, 1999) (final order on rehearing establishing rates) [hereinafter "1999 rate-setting proceeding"]. Pursuant to its holding in Bryan's complaint proceeding, the Commission held in the 1999 proceeding that Bryan was "entitled to unbundled transmission service and to nominate the resources that will be used to serve its loads." *Id.* at 1. In the meantime, effective September 1, 1999, the legislature amended PURA ("PURA99"), in part by adding statutory provisions in chapter 40 governing municipally owned utilities. Thus, PURA95 governs the first eight months of the 1999 rate-setting proceeding, whereas PURA99 governs the last four months of the proceeding.

TMPA sought judicial review of the 1999 rate-setting order in a Travis County district court. The district court reversed and remanded the proceedings to the Commission, due in part to the holding in the *San Antonio* case in 2001 invalidating the Commission's authority to set the wholesale transmission rates of municipally owned utilities. The district court's disposition of the 1999 rate-setting proceeding is the subject of this appeal in cause number 03-02-00701-CV.

### *Issues on Appeal*

By three issues, TMPA contends that the district court erred in reversing and remanding to the Commission the order concerning Bryan's complaint and portions of the 1999 rate-

setting order. All of TMPA's issues hinge on the assertion that the Commission lacks the authority both to adjudicate contract rights between TMPA and Bryan and to set wholesale transmission rates for a municipally owned utility. In its first issue, TMPA asserts that the district court erred in dismissing TMPA's request for a declaration that the Commission lacked jurisdiction. TMPA's argument relies in part on the disposition of TMPA's interlocutory appeal of a related Commission matter, in which this Court held that TMPA's administrative appeal did not deprive the district court of jurisdiction to consider TMPA's request for declaratory relief. *See Texas Mun. Power Agency v. Public Util. Comm'n*, 100 S.W.3d 510, 520-21 (Tex. App.—Austin 2003, pet. denied).

In its second issue, TMPA contends that the district court erred in granting Bryan's motion for partial summary judgment that as a matter of law chapter 35 of PURA conferred jurisdiction on the Commission to determine whether the terms on which TMPA provided transmission services to Bryan were reasonable. TMPA asserts that this holding was in error because TMPA does not provide transmission services to Bryan and, moreover, the Commission lacked jurisdiction to make the determination. In its third issue, TMPA contends that the district court erred in denying its motion for partial summary judgment that the Commission lacked jurisdiction over the matters at issue between TMPA and Bryan.

## ANALYSIS

*Jurisdiction of the Commission under Chapter 35 of PURA*

TMPA's second and third issues pertain to the district court's grant in both proceedings of one point of Bryan's traditional motion for partial summary judgment and the denial of TMPA's traditional motion for partial summary judgment. The standards for review of a

7

traditional summary judgment are well established: the movant must show there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See* Tex. R. Civ. P. 166a(c); *Pustejovsky v. Rapid-Am. Corp.*, 35 S.W.3d 643, 645-46 (Tex. 2000); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985). Here, the parties rely on statutory provisions to support their entitlement to summary judgment. In general, matters of statutory construction are questions of law rather than issues of fact. *City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 357 (Tex. 2000).

Generally, a party cannot appeal the denial of a motion for summary judgment because it is an interlocutory order and thus not appealable. *See Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 625 (Tex. 1996). However, when both parties move for summary judgment and the district court grants one motion and denies the other, the unsuccessful party may appeal both the prevailing party's motion and the denial of its own. *See Holmes v. Morales*, 924 S.W.2d 920, 922 (Tex. 1996). We will review the summary judgment evidence presented by both sides, determine all questions presented, and render such judgment as the trial court should have rendered. *Commissioners Court v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997). When, as here, a trial court grants summary judgment on a specific ground, we should consider all summary judgment grounds that the trial court ruled on, are preserved for review, and are necessary for a final disposition of the appeal. *Cates*, 927 S.W.2d at 625-26. We review the trial court's decision to grant summary judgment *de novo*. *Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex. 1994).

Bryan's motion for partial summary judgment was granted on the sole ground that "as a matter of law, PURA Ch. 35 conferred jurisdiction on the [Commission] to determine whether

8

the terms on which TMPA provided transmission service were reasonable." The parties agree that this requires us to apply principles of statutory construction in examining whether chapter 35 of PURA conferred jurisdiction on the Commission to make this determination.

Statutory construction is a question of law, which we review *de novo*. *Texas Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002). We must ascertain and give effect to the legislature's intent for the provision we are construing. *See Fleming Foods v. Rylander*, 6 S.W.3d 278, 284 (Tex. 1999); *Union Bankers Ins. Co. v. Shelton*, 889 S.W.2d 278, 280 (Tex. 1994); *Calvert v. Texas Pipe Line Co.*, 517 S.W.2d 777, 780 (Tex. 1974). The legislature's intent is determined by reading the language used in the particular statute and construing the statute in its entirety. *See In re Bay Area Citizens Against Lawsuit Abuse*, 982 S.W.2d 371, 380 (Tex. 1998); *Taylor v. Firemen's & Policemen's Civil Serv. Comm'n*, 616 S.W.2d 187, 190 (Tex. 1981). Further, we read every word, phrase, and expression in a statute as if it were deliberately chosen, and presume the words excluded from the statute are done so purposefully. *See Gables Realty Ltd. P'ship v. Travis Cent. Appraisal Dist.*, 81 S.W.3d 869, 873 (Tex. App.—Austin 2002, pet. denied); *City of Austin v. Quick*, 930 S.W.2d 678, 687 (Tex. App.—Austin 1996) (citing *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981)), *aff'd*, 7 S.W.3d 109 (Tex. 1999); *see also* 2A Norman J. Singer, *Sutherland Statutory Construction* § 47.25 (6th ed. 2000) (stating that there is generally an inference that omissions from a statute are intentional).

The supreme court cautions that, in construing statutes

[c]ourts must take statutes as they find them. . . . They should search out carefully the intendment of a statute, giving full effect to all of its terms. But they must find its intent in its language and not elsewhere. . . . They are not responsible for

9

omissions in legislation. They are responsible for a true and fair interpretation of the written law.

*RepublicBank Dallas, N.A. v. Interkal, Inc.*, 691 S.W.2d 605, 607 (Tex. 1985) (quoting *Simmons v. Arnim*, 220 S.W. 66, 70 (Tex. 1920)). Because canons of statutory construction may be cited to support conflicting interpretations of a disputed statute, we look to "the good sense of the situation and a simple construction of the available language to achieve that sense, by tenable means, out of the statutory language." Karl N. Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes are to be Construed*, 3 Vand. L. Rev. 395, 401 (1950).

In ascertaining the scope of an agency's authority, we give great weight to the contemporaneous construction of a statute by the administrative agency charged with its enforcement. *State v. Public Util. Comm'n*, 883 S.W.2d 190, 197 (Tex. 1994) (citing *Dodd v. Meno*, 870 S.W.2d 4, 7 (Tex. 1994); *Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex. 1993)). We recognize that the legislature intends an agency created to centralize expertise in a certain regulatory area "be given a large degree of latitude in the methods it uses to accomplish its regulatory function." *Id.*

Before addressing TMPA's second and third issues, we must be mindful of what is not before us. First, we are not asked to determine whether the Commission's orders were correct. Second, we are not asked to decide any contractual issues between TMPA and Bryan. Instead, the task before us is to decide the narrow question of whether chapter 35 of PURA conferred jurisdiction on the Commission to determine whether the terms on which TMPA provided transmission services to Bryan were reasonable. The parties agree on three matters concerning this question: the only

10

source of the Commission's jurisdiction is chapter 35; this chapter confers at least limited jurisdiction on the Commission; and we should resolve the jurisdictional issue. We thus turn to an examination of the provisions of chapter 35.

What became chapter 35 of PURA in 1997 was originally enacted as part of Title II of PURA95.[4] The purpose of Title II was to foster competition in the wholesale electric market and "establish a comprehensive regulatory system . . . to assure rates, operations, and services that are just and reasonable to consumers and to the utilities."[5] Chapter 35 "required all transmission-owning utilities to provide 'open access' to their transmission facilities for wholesale transmission." *San Antonio*, 53 S.W.3d at 312-13.

The supreme court held in *San Antonio* that "all powers that chapter 35 gives to the Commission extend to municipally owned utilities." *Id.* at 318; *see* PURA § 35.001 ("In this subchapter, 'electric utility' includes a municipally owned utility."). Chapter 35 gives the Commission the express power to

> ! ensure that an electric utility provides nondiscriminatory access to transmission service for qualifying facilities, exempt wholesale generators, power marketers, and other electric utilities;[6]

---

[4] Act of June 16, 1995, 74th Leg., R.S., ch. 765, §§ 2.07-.08, 1995 Tex. Gen. Laws 3972, 3999-4000, *amended by* Act of May 21, 1997, 75th Leg., R.S., ch. 166, § 1, secs. 35.001-.008, 1997 Tex. Gen. Laws 713, 766-67 (codified at PURA §§ 35.001-.008). The Legislature again amended PURA in 1999. Citations in this discussion are to the pre-1999 version of the act unless otherwise noted.

[5] *Id.* § 2.01, 1995 Tex. Gen. Laws 3972, 3988 (current version at PURA § 11.002(a) (West Supp. 2004)).

[6] PURA § 35.004(b).

! ensure that the utility recovers its reasonable costs in providing transmission services necessary for the transaction from the entity for which transmission is provided so that the utility's other customers do not bear the costs of the service;[7]

! require an electric utility to provide transmission service at wholesale to another electric utility, a qualifying facility, an exempt wholesale generator, or a power marketer and . . . determine whether the terms for the transmission service are reasonable;[8]

! adopt rules relating to wholesale transmission service, rates, and access;[9] and

! require that each party to a dispute concerning prices or terms of wholesale transmission service engage in a nonbinding alternative dispute resolution process before seeking resolution of the dispute by the commission.[10]

*See San Antonio*, 53 S.W.3d at 319-20. Chapter 35 does not, however, give the Commission the authority to set wholesale transmission rates for municipally owned utilities. *Id.* at 321. Instead, chapter 35 gives the Commission "largely an oversight role . . . with respect to wholesale transmission transactions." *Id.* at 320. "By its plain language, the statute anticipates disputes between individual utilities about the price for wholesale transmission service . . . . Should the parties not be able to agree on the terms for service, they can turn to the Commission." *Id.* We now turn to an examination of whether the assertions in Bryan's complaint against TMPA fall within the Commission's jurisdiction under chapter 35.

---

[7] *Id.* § 35.004(c).

[8] *Id.* § 35.005(a).

[9] *Id.* § 35.006(a).

[10] *Id.* § 35.008.

In its complaint, Bryan contended that the TMPA board's actions in reallocating expenses violated the orders in the 1997 and 1998 rate-setting proceedings because the actions resulted in charging Bryan a higher rate for transmission than permitted under those orders. Bryan further asserted that the board actions violated several provisions of PURA chapter 35:

> The attempt by the Northern Cities to use TMPA to reassign their . . . costs to Bryan causes TMPA to be in violation of PURA Sections 35.003, 35.004 and 35.005. Section 35.003 prohibits TMPA from granting a preference to any person in connection with the purchase or sale of electric energy at wholesale. The rate resolution violates this section because it grants a preference to the three Northern Cities by lowering their transmission costs at Bryan's expense. The rate resolution also violates Sections 35.004(a) and 35.004(b) of PURA. Section 35.004(a) requires transmission service rates charged by an electric utility to be comparable to the rates charged by the utility for the use of its system. Section 35.004(b) requires that an electric utility's transmission rates be non-discriminatory. The rate resolution violates these sections because it results in lower transmission rates for some users (the three Northern Cities) than for other users (Bryan . . .), rather than in "comparable" rates. This action also violates Section 35.004(c) of PURA, which precludes an electric utility from shifting transmission costs from one customer to another customer, in that it causes Bryan to bear the transmission costs of TMPA's other customers, the three Northern Cities.
>
> The resolution also violates PURA Section 35.005, which requires transmission service rates to be reasonable, in that the resulting rates are not reasonable.

TMPA conceded at oral argument that it does not generally dispute the Commission's jurisdiction over wholesale transmission rates. TMPA asserts, however, that it does not provide wholesale transmission service to Bryan and therefore Bryan's complaint does not fall within the purview of the Commission's jurisdiction under chapter 35. Under PURA, transmission service "includes construction or enlargement of facilities, transmission over distribution facilities, control area services, scheduling resources, regulation services, reactive power support, voltage control,

13

provision of operating reserves, and any other associated electrical service the commission determines appropriate."[11]  Commission regulations illumine this definition, explaining that transmission service "allows a transmission service customer to use the transmission and distribution facilities of electric utilities, electric cooperatives and municipally owned utilities to efficiently and economically utilize generation resources to reliably serve its loads and to deliver power to another transmission service customer."  16 Tex. Admin. Code § 25.5(141) (West 2003).  A transmission service customer is a "transmission service provider, distribution service provider, river authority, municipally-owned utility, . . . or other person whom the commission has determined to be eligible to be a transmission service customer."  *Id.* § 25.5(142) (West 2003).  TMPA does not dispute that Bryan is its customer, but rather disputes that Bryan is its *transmission service* customer.

TMPA asserts that it is its own transmission service customer because the power sales contract requires it to bear all responsibility for delivering power to Bryan at the point of delivery. However, in the 1997 rate-setting proceeding, which required a utility to apply for transmission service if it were a transmission customer, 21 Tex. Reg. 3343, 3353 (1996), *repealed* 24 Tex. Reg. 2873 (1999) (former Commission rule 23.70(e)), TMPA declared to the Commission that

> TMPA is not a transmission customer, either in actuality or pursuant to the Commission's rules. . . . TMPA is not a transmission customer because TMPA is not receiving transmission service.  TMPA has no load responsibility.  The electricity

---

[11]  Act of May 21, 1997, 75th Leg., R.S., ch. 166, § 1, sec. 31.002(7), 1997 Tex. Gen. Laws 713, 745 (amended 1999) (current version at PURA § 31.002(20) (West Supp. 2004)).

generated by TMPA is purchased by its customers, who *bear all load responsibility* for TMPA's generation. TMPA requests the Commission to revise the matrices attached to the proposed order to delete the designation of TMPA as a "transmission customer."

(Emphasis added.) In the final order, the Commission left TMPA's load responsibility blank and listed the member cities as nominating their own loads. Similarly in the 1998 rate-setting proceeding, the Commission listed TMPA as bearing no load responsibility and the member cities as nominating their own loads.

In Bryan's complaint proceeding, the Commission cited a portion of TMPA's representation that it was not a transmission service customer and determined that Bryan was authorized to nominate its own load. In the 1999 rate-setting proceeding, the Commission concluded that "the fact that the Cities sought and obtained unbundled transmission services for 1997 and 1998 indicates that the contractual arrangement does not preclude Bryan from obtaining unbundled services." Based on TMPA's representations in the earlier proceedings that it was not a transmission customer because its member cities nominated their own loads—upon which the Commission was entitled to rely in the later proceedings—we disagree with TMPA's assertion that the member cities are not wholesale transmission service customers. We thus conclude that Bryan is a wholesale transmission service customer of TMPA.

TMPA next asserts that the Commission lacked the authority to determine that Bryan is entitled to nominate its own load because the dispute solely pertains to the rates prescribed by the power sales contract. Accordingly, TMPA argues, the Commission's orders allowing Bryan to take

15

unbundled service were impermissible reformations of the contract between TMPA and Bryan.[12]

TMPA further asserts that the Commission's orders constitute rate setting, which the supreme court invalidated in the *San Antonio* case.

All parties agree that the Commission does not have the authority to adjudicate contract disputes. The point of disagreement is whether the Commission's orders constitute an adjudication of a contract dispute. As those issues are pending in a separate suit, we are not being asked to decide any contractual issues between TMPA and Bryan. Even assuming that the Commission's orders were an adjudication of contract rights, the Commission's actions would be permissible: TMPA's enabling statute reserves the State's "power to regulate an agency's rates and charges for electric energy supplied by the agency's facilities." PURA § 163.063(b) (West 1998).

We thus turn to TMPA's assertion that the Commission engaged in rate setting when it determined that Bryan could nominate its own load. In its complaint, Bryan alleged that TMPA had violated chapter 35 by granting a rate preference to the Northern Cities, engaging in discriminatory pricing, impermissibly shifting transmission costs from one customer to another customer, and setting rates that were higher than the rates set by the 1997 and 1998 proceedings. Thus, Bryan asked the Commission to examine wholesale transmission charges that the TMPA board of directors had already set. Under the limits of chapter 35 set forth in *San Antonio*, Bryan's complaint and subsequent request to nominate its own load in the 1999 rate-setting proceeding fell within the Commission's jurisdiction. Under chapter 35, the Commission has "the specific power

---

[12] Although TMPA quoted portions of the power sales contract in its pleadings in Bryan's complaint proceeding, TMPA never introduced the contract into evidence.

16

to review rates for reasonableness." *San Antonio*, 53 S.W.3d at 319. The chapter additionally confers on the Commission the express power "to ensure that all utilities provide nondiscriminatory access to transmission service." *Id.* "Once confronted with a dispute between utilities," as occurred here, under chapter 35 "the Commission can arrive at a reasonable rate to resolve that dispute." *Id.* at 320. That was precisely the Commission's role in examining Bryan's complaint and, in the 1999 rate-setting proceeding, in reviewing Bryan's request to nominate its own load.

Moreover, even had Bryan not filed a complaint, "to ensure that utilities are providing comparable prices and services and non-discriminatory access, and *to protect a utility's customers from bearing others' transmission costs*, the Commission has the independent ability to order utilities to appear before it even without a dispute." *Id.* (emphasis added). We do not find that the district court erred in granting Bryan's motion for partial summary judgment that "as a matter of law, chapter 35 of PURA conferred jurisdiction on the Commission to determine whether the terms on which TMPA provided transmission services to Bryan were reasonable."[13] Accordingly, the district court further did not err in denying TMPA's motion for partial summary judgment as to the Commission's jurisdiction.

---

[13] TMPA additionally argues that chapter 40 of PURA, effective September 1, 1999, limits the Commission's jurisdiction. *See generally* PURA §§ 40.001-.104 (West Supp. 2004). Chapter 40, however, was adopted after Bryan's complaint proceeding and applies to the 1999 rate-setting proceeding only for the last four months of 1999. Furthermore, chapter 40 grants a municipally owned utility the exclusive jurisdiction to "set all terms of access, conditions, and rates applicable to services provided by the municipally owned utility, . . . but *excluding wholesale transmission rates, terms of access, and conditions for wholesale transmission service* set by the commission under this subtitle." *Id.* § 40.055(a)(1) (emphasis added). Thus, chapter 40 does not limit the Commission's oversight jurisdiction under chapter 35.

17

TMPA contends nevertheless that the Commission lacked jurisdiction to hear Bryan's complaint because the Commission's wholesale transmission rate matrix was based on rules that *San Antonio* has since invalidated. We disagree. The invalidation of the rules in 2001 does not figure into whether Bryan's complaint fell within the Commission's chapter 35 jurisdiction. Additionally, it was appropriate for the district court to remand these proceedings to the Commission in light of the *San Antonio* case and the 1999 amendments to PURA. The Commission should have the opportunity to reconsider its orders on remand. We may not make substantive decisions committed by statute to the Commission. *Public Util. Comm'n v. GTE-SW*, 833 S.W.2d 153, 175 (Tex. App.—Austin 1992), *aff'd in part, rev'd in part on other grounds*, 901 S.W.2d 401 (Tex. 1995). "[T]he terms of the final order are matters committed to agency discretion as long as the agency corrects the assignment of errors sustained on appeal." *Id.* Were we to render judgment, we would usurp the Commission's authority to revisit the issues in light of the *San Antonio* holding and the 1999 amendments to PURA.

### TMPA's Request for Declaratory Relief

TMPA conceded at oral argument that if we were to reach the jurisdictional issue, its request for a declaration that the Commission was without jurisdiction would be redundant. Having found that chapter 35 of PURA conferred jurisdiction on the Commission to determine whether the terms on which TMPA provided transmission services to Bryan were reasonable, we hold that TMPA's request for declaratory relief is unnecessary and redundant. Accordingly, we overrule all of TMPA's issues, affirming the district court's grant of summary judgment in favor of Bryan, denial

18

of TMPA's motions for partial summary judgment, and dismissal of TMPA's request for declaratory relief. We affirm the judgments of the district court.

**CONCLUSION**

The issue before us is whether chapter 35 of PURA conferred jurisdiction on the Commission to determine whether the terms on which TMPA allocated wholesale costs for transmission of electricity to Bryan were reasonable. Although TMPA disputes that Bryan is its wholesale transmission customer, based on TMPA's representations in earlier proceedings, on which the Commission was entitled to rely in its determination of the proceedings before us on appeal, we conclude that Bryan is a wholesale transmission customer of TMPA.

In its complaint, Bryan asked the Commission to examine the allocation of rates by the TMPA board of directors and asserted that the board's actions violated several provisions of chapter 35. This chapter grants the Commission "the specific power to review rates for reasonableness." *San Antonio*, 53 S.W.3d at 319. The chapter additionally gives the Commission the express power "to ensure that all utilities provide nondiscriminatory access to transmission service." *Id.* "Once confronted with a dispute between utilities," as occurred here, under chapter 35 "the Commission can arrive at a reasonable rate to resolve that dispute." *Id.* at 320. Because Bryan's complaint and subsequent request to nominate its own load in the 1999 rate-setting proceeding falls within the Commission's jurisdiction under chapter 35, we uphold the district court's grant of partial summary judgment in favor of Bryan that "as a matter of law, chapter 35 of PURA conferred jurisdiction on the Commission to determine whether the terms on which TMPA provided transmission services to Bryan were reasonable." Furthermore, given that TMPA concedes

19

that our determination of the jurisdictional issue renders redundant its request for a declaration that the Commission lacked jurisdiction, we affirm the district court's dismissal of TMPA's request for declaratory relief.  We affirm the judgments of the district court.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed:   January 29, 2004