TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN





ON MOTION FOR REHEARING








NO. 03-07-00709-CV






Reynolds Metals Company, Appellant


v.


Susan Combs, Successor to Carole Keeton Strayhorn, Comptroller of Public Accounts of
the State of Texas, and Greg Abbott, Attorney General of the State of Texas, Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT

NO. D-1-GN-04-001468, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 Upon consideration of appellant's motion for rehearing, we overrule the motion;
however, we withdraw our opinion and judgment dated February 4, 2009, and substitute the
following in its place.

 This is an appeal from a summary judgment in a suit to recover a sales tax refund. 
The sole issue presented is whether Reynolds Metals Company's purchase of parts for two ship
unloaders that operate on rails qualified for the rolling stock exemption to the Texas sales and use
tax. Concluding that the district court did not err in granting summary judgment that Reynolds's
purchases do not qualify under the exemption, we will affirm the district court's judgment.

 Reynolds produces and manufactures aluminum oxide, or alumina, at a plant in
Gregory, Texas. It extracts the alumina from bauxite ore, which it receives by ship. Reynolds uses
the ship unloaders at issue in this appeal to unload the bauxite ore from the ships and dump the ore
onto a series of conveyors for further processing.

 After exhausting administrative remedies, Reynolds filed suit under chapter 112
of the tax code seeking a refund of sales and use tax the Comptroller required it to pay on
parts and services related to its production system for the period between March 1, 1994,
through December 31, 2000. Among Reynolds's contentions was that its purchases of repair and
replacement parts for its ship unloaders were exempt from sales and use tax under section 151.331
of the tax code. Section 151.331 provides, in relevant part:


(a) Rolling stock, locomotives, and fuel and supplies essential to the operation
of locomotives and trains are exempted from the taxes imposed by this
chapter.



Tex. Tax Code Ann. § 151.331(a) (West 2008). Reynolds alleged that its "ship unloaders qualify
as rolling stock because they operate on and are supported by rails."

 Reynolds and the Comptroller (1) filed cross-traditional motions for partial summary
judgment that joined issue on whether Reynolds's purchase of repair and replacement parts for its
ship unloaders fell within the rolling-stock exemption of section 151.331. (2) Reynolds presented
undisputed affidavit testimony that the unloaders "have wheels similar to those found on trains
and like trains travel by rolling on two railroad rails that were constructed to support them," "are
designed to operate solely on those two rails and rely on those rails for support," and "are self
propelled and are powered by electro-hydraulic traction motors." (3) However, Reynolds's summary-judgment evidence also included schematic drawings of the unloaders showing them to be large,
crane-like structures of approximately 83 feet in height and 82 feet in front-to-back length along
their wheel base. Other features of the unloaders were revealed in Reynolds's responses to the
Comptroller's requests for admissions, which the Comptroller presented in support of its traditional
motion:



 the gauge or width of the rails on which the ship unloaders operated was
forty-seven feet


 


 the unloaders were used to transport bauxite from a ship's hold to a conveyor
belt by using a bucket dredge to dig the bauxite out of the hold and place it
on the conveyor


 


 the unloaders moved on the rails to position themselves between the ship's
hold and the conveyor on which they placed the bauxite


 


 during the period at issue, each unloader was not "a railway vehicle that
provides the motive power for a train [that] has no payload capacity of its
own [and whose] sole purpose is to move the train along the tracks"


 


 during the period at issue, Reynolds was not a railroad common carrier or
motor common carrier, did not represent its business to the public as one of
transporting persons or freight from place to place for compensation or as
being open to the public for transportation use, and that its use of the
unloaders was not subject to the Federal Railroad Safety Act of 1970, the
Federal Railroad Safety Authorization Act of 1994, the Federal Railroad
Administration, the U.S. Department of Transportation, or regulated by the
Texas Railroad Commission




On the other hand, Reynolds denied requests for admissions that the unloaders were not "self-propelled railway vehicle[s] designed to transport passengers" or "rail vehicles that move along
guides to transport freight or passengers from one place to another." In response to a related
interrogatory, Reynolds elaborated that "[t]he unloaders are designed to transport freight and
passengers and do in fact carry bauxite and employees of [Reynolds]."

 The district court denied Reynolds's summary-judgment motion and granted the
Comptroller's cross-motion "on the ground that [Reynolds] is not entitled to the rolling stock
exemption in Texas Tax Code § 151.331(a)." Subsequently, Reynolds abandoned its other claims
and the district court rendered final judgment for the Comptroller. This appeal ensued.

 In a single issue, Reynolds argues that the district court erred in granting the
Comptroller's summary-judgment motion and denying Reynolds's motion because its purchase
of repair and replacement parts for its two ship unloaders came within the rolling-stock exemption
in section 151.331(a). When parties file cross-motions for summary judgment on overlapping
issues and the trial court grants one motion and denies the other, an appellate court should review
the summary-judgment evidence supporting each motion and determine all questions presented. FM
Props. Operating Co. v. City of Austin, 22 S.W.3d 868, 872 (Tex. 2000). The appellate court
"should render the judgment that the trial court should have rendered." Id.

 Our disposition of Reynolds's issue turns on construction of the "rolling stock"
exemption to the Texas sales and use tax; specifically, whether Reynolds's ship unloaders constitute
"rolling stock" and whether the parts constitute "rolling stock" or "fuel and supplies essential to
the operation of locomotives and trains." Tex. Tax Code Ann. § 151.331(a). Statutory construction
presents a question of law that we review de novo. See State v. Shumake, 199 S.W.3d 279, 284
(Tex. 2006). Our primary objective in statutory construction is to give effect to the legislature's
intent. Id. We seek that intent "first and foremost" in the statutory text. Lexington Ins. Co.
v. Strayhorn, 209 S.W.3d 83, 85 (Tex. 2006). We rely on the plain meaning of the text, unless
a different meaning is supplied by legislative definition or is apparent from context, or unless such
a construction leads to absurd results. City of Rockwall v. Hughes, 246 S.W.3d 621, 625-26
(Tex. 2008); see Tex. Gov't Code Ann. § 311.011 (West 2005) ("[w]ords and phrases shall be read
in context and construed according to the rules of grammar and common usage"). However, with
regard to a statute that an agency is charged with enforcing, we give "serious consideration" to the
agency's construction of it, so long as that construction is reasonable and consistent with the
statutory language, and this is particularly true when the statute involves complex subject matter
within the agency's area of expertise. See First Am. Title Ins. Co. v. Combs, 258 S.W.3d 627, 632
(Tex. 2008); cf. Rylander v. Fisher Controls Int'l, Inc., 45 S.W.3d 291, 302 (Tex. App.--Austin
2001, no pet.) (courts "do not defer to administrative interpretation in regard to questions which do
not lie within administrative expertise or deal with a nontechnical question of law") (internal citation
omitted). In this case, we are also guided by the principle that tax exemptions are strictly construed
against the taxpayer in favor of the taxing authority. See First Baptist Church v. Bexar County
Appraisal Review Bd., 833 S.W.2d 108, 117 (Tex. 1992).

 Reynolds places little emphasis on the text of section 151.331(a) itself. It instead
argues that we must look to imputed or inferred legislative intent under the doctrine of legislative
acceptance. The doctrine of legislative acceptance contemplates that "[a] statute of doubtful
meaning that has been construed by the proper administrative officers, when re-enacted without
any substantial change in verbiage, will ordinarily receive the same construction." Humble Oil &
Ref. Co. v. Calvert, 414 S.W.2d 172, 180 (Tex. 1967). The doctrine derives from a presumption
that the legislature is familiar with its previously enacted statutes and the manner in which courts
and agencies have construed and applied them. Texas Dep't of Protective & Regulatory Servs.
v. Mega Child Care, Inc., 145 S.W.3d 170, 196 (Tex. 2004). Based on that presumption, it is further
presumed that if the legislature re-enacts an ambiguous statute that has been interpreted by a court
of last resort or by the appropriate administrative officer, the legislature intends to adopt the
construction of the court or the administrative officer. See id.

 Reynolds asserts that "for decades, the Comptroller interpreted the rolling stock
exemption to include any equipment that was operated on railroad rails" (which it asserts the
ship unloaders were) and "also consistently applied the exemption to parts used to repair rolling
stock." Reynolds complains that in 2000, toward the end of its refund period, "the Comptroller
reversed its longstanding policy with a new policy that limited the exemption to 'conventional
or traditional railroad equipment, or, at the least, equipment mounted on rails that connect to
traditional railroads.'" See Tex. Comptroller of Pub. Accounts, STAR Document No. 200007600H
(effective July 5, 2000). (4) The Comptroller's "new policy" conflicts with section 151.331(a),
Reynolds contends, because the legislature manifested its intent to adopt the Comptroller's
"longstanding policy" when--without substantive change to the language that now appears in
section 151.331(a)--it reenacted the rolling stock exemption in 1969, (5) it nonsubstantively recodified
the entire sales and use tax statute in 1982, (6) and reenacted the exemption when adding subsection (b)
to section 151.331(a). (7) We disagree.

 For the legislative acceptance doctrine to apply based on an administrative
interpretation of a statute, the interpretation must be longstanding, uniform, and clear. See Calvert,
414 S.W.2d at 180 (applying legislative acceptance doctrine where Comptroller had "consistently
allocated" franchise tax receipts under "location of payor test" between 1917 and 1963); Texas
Citrus Exch. v. Sharp, 955 S.W.2d 164, 171 (Tex. App.--Austin 1997, no pet.) (holding legislative
acceptance doctrine inapplicable to "the Comptroller's unwritten policy in implementing one of its
own rules, a policy on which the Comptroller has flip-flopped three times in thirteen years"). (8)

 Both parties refer us to the Comptroller's rules implementing the rolling stock
exemption and various Comptroller decisions. As originally promulgated following the 1961
enactment of the sales and use tax, the Comptroller's rule included a definition of "rolling stock":
"The term 'rolling stock' shall apply only to the railroad industry and there it shall mean that railroad
cars used for carrying of persons or property, the engine or locomotive, and the railroad cars
used for the carrying of fuel to power the train." See Tex. Comptroller of Pub. Accounts, STAR
Document No. 6203R0074D09 (effective March 21, 1962). In 1963, the Comptroller changed the
rule to provide that "[t]he term "rolling stock" means and includes any equipment which is operated
on railroad rails." See Tex. Comptroller of Pub. Accounts, STAR Document No. 6309R0074D03
(effective Sept. 6, 1963). This language remained in subsequent versions of Ruling 14 and its
successor, Rule .017, until the Comptroller omitted the definition in a revised version of the rule
that took effect on March 31, 1982. See Tex. Comptroller of Pub. Accounts, STAR Document
No. 8203R0382D11 (effective March 31, 1982), codified at 34 Tex. Admin. Code § 3.297 (2008). 
The new rule provided simply that "Sales or use tax is not due on the sale or use of locomotives and
rolling stock." Id. Observing that the 1982 rule change occurred after the 1982 recodification of the
rolling stock exemption, Reynolds argues that the legislature in the 1982 enactment necessarily
intended to incorporate the construction from the Comptroller's former rule. Reynolds also cites five
pre-codification Comptroller letter rulings that it contends adopted its asserted construction.

 Reynolds further argues that even after its 1982 rule change, the Comptroller
continued its "longstanding policy applying the rolling stock exemption to any equipment operated
on railroad rails." Reynolds urges that "the preambles to the proposed [1982] regulation and the
adopted regulation gave no indication of a change in Comptroller policy regarding rolling stock." 
Reynolds also cites a post-codification, post-rule change Comptroller letter ruling from 1982 and
two from 1990 that, it asserts, reflect a continuation of the "longstanding policy." It reasons that the
legislature again adopted this interpretation when reenacting and amending the rolling stock
exemption in 1996.

 Four of the five pre-codification letter rulings cited by Reynolds do not demonstrate
any construction of "rolling stock"--favorable or unfavorable to Reynolds--by the Comptroller. 
See Tex. Comptroller of Pub. Accounts, STAR Document Nos. 6602H0259E12 (issued Feb. 9,
1966); 7407L0020B05 (issued July 1, 1974); 7506L0022D10 (issued June 1, 1975); 7607L0026A08
(issued July 1, 1976). In each of these rulings, the Comptroller determined that certain equipment
purchased by a company for intraplant operations was exempt as rolling stock. At issue, however,
was not the proper construction of the term "rolling stock" but whether the fact that the taxpayer
was not in the business of being a common carrier was material to the exemption's application. The
rulings contain no description of the equipment at issue and no discussion of the construction of the
term "rolling stock." It is simply presumed that the equipment is "rolling stock." The rulings rest
solely upon the determination that "[t]he fact that the taxpayer is not in the business as a common
carrier is immaterial, as the exemption relates to all rolling stock." Id.

 In the other pre-codification decision cited by Reynolds, the taxpayer was in the
business of selling railroad car scraps and culverts. See Tex. Comptroller of Pub. Accounts, STAR
Document No. 7801H0268A12 (issued Jan. 20, 1978). The equipment at issue included cranes that
were self-propelled and permanently mounted on railroad rails. The cranes were "used in moving
salvage materials around the salvage yard, disassembling railroad cars, and unloading scrap metal
from railroad cars." Id. According to the Comptroller in its ruling, "the key element is whether or
not the equipment is permanently mounted or permanently operated on railroad rails and not the
use the equipment is put to by its operators." Id. Reynolds emphasizes the Comptroller's focus on
the fact that the cranes were mounted and operated on railroad rails, suggesting a parallel to its crane-like ship unloaders. However, it remains that the cranes at issue in the decision, unlike Reynolds's
ship unloaders, were mounted on traditional railroad tracks and used in operations involving
traditional railroad equipment. Given this factual context, it is a stretch to read this ruling as
standing for the proposition that literally any equipment that could be said to operate on railroad
rails--including a ship unloader on rails spaced 47 feet apart--constitutes "rolling stock." And,
even if it could support Reynolds's interpretation, a single decision does not constitute the sort
of longstanding administrative interpretation that the legislative acceptance doctrine requires. City
of Austin v. Southwestern Bell Tel. Co., 92 S.W.3d 434, 445 (Tex. 2002); see also Wilson v. State,
___ S.W.3d ___, No. 03-07-60444-CV, 2008 Tex. App. LEXIS 8738 (Tex. App.--Austin 2008,
no pet. h.).

 Moreover, the Comptroller cites to a 1976 letter ruling that suggests a narrower
view of the rolling stock exemption. See Tex. Comptroller of Pub. Accounts, STAR Document
No. 7609T0029A05 (issued Sept. 1, 1976). At issue was the taxability of a self-propelled stacker
built on wheels to run on railroad tracks approximately 600 to 700 feet in length. Although the
Comptroller held the equipment not to be exempt based on whether they were "rolling stock" when
they entered the state, the Comptroller observed that if, 

the materials had not been fabricated out of state and shipped into Texas, it is still
doubtful whether the stacker itself constitutes "rolling stock" within the meaning of
Article 20.04(S). "Rolling Stock" is defined in Ruling .017 as "any equipment which
is operated on railroad rails." Although the stacker operates on rails which could be
used for railroad purposes, it is not rolling stock in the sense used in Article 20.04(S)
which, speaks to "locomotives and rolling stock" and "locomotives and trains". The
stacker is better described in Article 20.04(E)(b)(ii): machinery, equipment,
materials and supplies used in a manner that is merely incidental to the
manufacturing, processing or fabricating operation such as intraplant transportation
equipment . . . . Such intraplant transportation equipment is not exempt.



Id. Reynolds acknowledges that this ruling "questions" what it contends was "the Comptroller's
longstanding policy" in interpreting the rolling stock exemption, but dismisses it as dicta. Even so,
it is nonetheless indicative of the absence of the sort of clear, consistent, and longstanding
administrative policy that the legislative acceptance doctrine contemplates. See Fleming Foods of
Tex., Inc. v. Rylander, 6 S.W.3d 278, 282 (Tex. 1999) (legislative acceptance doctrine inapplicable
where, among other things, the Comptroller's administrative interpretations had been inconsistent). 

 We also question whether the legislative acceptance doctrine properly applies to the
1982 recodification of the tax code. (9) The logical underpinning of the legislative acceptance doctrine,
as previously suggested, is that the legislature's intent to "accept" a prior judicial or administrative
construction of a statute when reenacting it may be inferred from the fact that the legislature
chose not to make substantive changes under circumstances when it might otherwise have been
expected to do so if it had disagreed with the judicial or administrative interpretation. See Calvert,
414 S.W.2d at 175 (tax code provision was substantively amended). However, the legislature's
expressed intent in the 1982 recodification of the tax code was to make no substantive changes in
the law. Act of May 29, 1981, 67th Leg., R.S., ch. 389, § 40, 1981 Tex. Gen. Laws 1490, 1787
("This Act is intended as a recodification only, and no substantive change in the law is intended by
this Act."). It is dubious to infer legislative intent from the fact that the legislature chose not to make
a substantive change to the rolling stock exemption in a recodification whose express purpose was
to make no substantive changes to the tax code. See Public Util. Comm'n of Tex. v. City Pub. Serv.
Bd., 53 S.W.3d 310, 324 (Tex. 2001) (distinguishing statutory reenactment from recodification, and
holding that legislative acceptance is based only on the former). (10)

 Nor do the post-codification developments evidence the requisite longstanding, clear
and consistent policy regarding interpretation of "rolling stock" such that the legislative-acceptance
doctrine could apply to the 1996 amendment and reenactment of section 151.331. To the extent the
Comptroller's former definition of "rolling stock" was significant, it was repealed in 1982. Reynolds
cites a Comptroller letter ruling later that year determining that the rolling stock exemption applied
to scrap bucket transfer cars because the cars were "permanently mounted or permanently operated
on railroad rails." See Tex. Comptroller of Pub. Accounts, STAR Document No. 8207L0466B04
(issued July 14, 1982). Reynolds points out that there is no indication that the rolling stock was
connected to a traditional railroad. However, there is also no indication that the rolling stock was
not connected to a traditional railroad. The ruling is simply silent. It addresses the rolling stock
issue in only three sentences:


 To be rolling stock, the equipment must be permanently mounted or permanently
operated on railroad rails. It appears that the scrap bucket transfer cars meet the
qualification for rolling stock. The trackmobile may also be rolling stock if it is never
removed from the tracks. 



Id. Based on the ruling, we cannot determine whether the equipment at issue was mounted on
traditional railroad rails or used in traditional railroad operations. It is equally probable as not that
the equipment was mounted on traditional railroad rails or used in relation to traditional railroad
operations.

 Reynolds also cites a 1990 ruling involving an amusement car train. See
Tex. Comptroller of Pub. Accounts, STAR Document No. 9003L0996A01 (issued Mar. 30, 1990). 
The Comptroller determined that the rolling stock exemption applied. Although Reynolds contends
that there was "[n]o indication that the rolling stock was connected to a traditional railroad," the
equipment at issue was simply smaller scale traditional railroad equipment, including "locomotives"
and "coaches" or "trains." Id.; see also 34 Tex. Admin. Code § 3.297 (specifically referring to
"locomotives" and "trains" in applying the exemption).

 Reynolds cites another 1990 letter ruling in which the Comptroller determined
that the rolling stock exemption applied to train unloaders. See Tex. Comptroller of Pub. Accounts,
STAR Document No. 9002L0979E06 (issued Feb. 8, 1990). Unlike the ship unloaders operated by
Reynolds, the train unloaders were mounted on traditional railroad tracks and were used in
conjunction with traditional railroad equipment. In fact, in its ruling, the Comptroller suggests
that this fact might be an essential component of the determination: "You also assured me that the
loader will not be removed from the train." Id. The Comptroller's emphasis on this fact in its ruling
is significant and evidences a relationship between the exemption and traditional railroads and
railroad equipment.

 In sum, the Comptroller did not have a long-standing, clear and consistent policy
of interpreting the "rolling stock" exemption to apply literally to any equipment mounted on what
could be termed railroad rails such that we would infer the legislature's intention to adopt that
interpretation through its 1982 or 1996 enactments. If anything, the history of the Comptroller's
application of the exemption during this period demonstrates a consistent policy of tying the rolling
stock exemption to traditional railroad equipment. The legislative acceptance doctrine does not
support Reynolds's proposed construction of the exemption.

 We further conclude that the Comptroller's interpretation that the rolling stock
exemption does not extend to Reynolds's ship unloaders is reasonable and not inconsistent with
the statutory language. See First Am. Title Ins. Co., 258 S.W.3d at 632 (we give "serious
consideration" to the agency's construction of a statute, as long as that construction is reasonable
and consistent with the statutory language). In light of the Comptroller's construction and the
requirement that tax exemptions be strictly construed against the taxpayer and in favor of the taxing
authority, see First Baptist Church, 833 S.W.2d at 117, we agree with the district court that, as a
matter of law, the rolling stock exemption does not apply to Reynolds's ship unloaders and that
summary judgment on that issue was appropriate.


 We affirm the district court's judgment.



 __________________________________________

 Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Waldrop

Affirmed on Motion for Rehearing

Filed: April 8, 2009

1. Because the interests of the Comptroller and the Attorney General in the litigation align,
we refer to them collectively as the "Comptroller." See Tex. Tax Code Ann. § 112.053 (West 2008)
(requiring the Comptroller and the Attorney General to be named as defendants in tax protest suit). 
2. The Comptroller also asserted the ground that Reynolds was not a licensed and certificated
common carrier, which it asserted was required under its rule implementing the rolling stock
exemption. See 34 Tex. Admin. Code § 3.297(a)(1) (1999). The Comptroller similarly filed a no-evidence cross-motion for partial summary judgment on the ground that there was no evidence
Reynolds's purchases for the ship unloaders were "essential to the operation of locomotives and
trains" or that "the parts are required by federal or state regulation." Id. § 3.297(f). The district court
explicitly denied summary judgment on these grounds, and they are not before us on appeal.
3. Reynolds also presented affidavit testimony regarding the nature of the repair and
replacement parts at issue: "The Parts include a replacement unloader motor, unloader motor repair
parts, unloader buckets, unloader bucket repair parts, an unloader boom cylinder, unloader chains,
unloader chain repair parts, unloader drive shafts, unloader bearings, unloader cylinders, unloader
hydraulic system parts, an unloader hydraulic pump, an unloader rail clamp, and various other
repair and replacement parts for the Unloaders." "All of these parts," furthermore, "were purchased
to repair or replace portions of the Unloaders . . . were incorporated into the Unloaders and became
essential components of the Unloaders."
4. "STAR" refers to the "State Tax Automated Research" System, available on the
Comptroller's website at http://cpastar2.cpa.state.tx.us/.
5. As originally enacted in 1961, the rolling stock exemption provided:


There are exempted from the taxes imposed by this Chapter receipts from any sale,
use, storage or other consumption of locomotives and rolling stock, including fuel or
supplies for the direct operation of locomotives and trains.


Act of Aug. 8, 1961, 57th Leg., 1st C.S., ch. 24, 1961 Tex. Gen. Laws 71, 86. In 1963, the
legislature reenacted the exemption with the same language:


There are exempted from the taxes imposed by this Chapter receipts from any sale,
use, storage, or other consumption of locomotives and rolling stock, including fuel
or supplies for the direct operation of locomotives and trains.


Act of May 2, 1963, 58th Leg., R.S., ch. 138, 1963 Tex. Gen. Laws 371, 387. Thereafter, between
1963 and 1982, the legislature amended various exemptions to the sales and use tax without
changing the substance of the rolling stock exemption. Reynolds emphasizes that in 1969, the
legislature repealed the entire exemption statute and reenacted it with amendments, but reenacted
the former language of the rolling stock exemption verbatim. Act of Sept. 6, 1969, 61st Leg., 2nd
C.S., ch. 1, 1969 Tex. Gen. Laws 61, 78.
6. The 1982 recodified version of the rolling stock exemption consisted of the language that
now appears in subsection (a) of section 151.331(a):


Rolling stock, locomotives, and fuel and supplies essential to the operation of
locomotives and trains are exempted from the taxes imposed by this chapter.


Act of May 29, 1981, 67th Leg., R.S., ch. 389, § 1, 1981 Tex. Gen. Laws 1490, 1569; see also id.
§ 40 ("This Act is intended as a recodification only, and no substantive change in the law is intended
by this Act.").
7. In 1995, the legislature renumbered the 1982 version as subsection (a) of section 151.331
and added a new subsection (b): "Electricity, natural gas, and other fuels used or consumed
predominantly in the repair, maintenance, or restoration of rolling stock are exempt from the taxes
imposed by this chapter." Act of May 28, 1995, 74th Leg., R.S., ch. 1025, § 1, 1995 Tex. Gen. Laws
5105, 5106; see also Tex. Const. art. III, § 36 (requiring that section or sections of existing laws
amended by the legislature "shall be re-enacted and published at length").
8. The legislative acceptance doctrine also does not apply unless the statute at issue is
ambiguous. See Fleming Foods of Tex., Inc. v. Rylander, 6 S.W.3d 278, 282 (Tex. 1999) (citing
Humble Oil & Ref. Co. v. Calvert, 414 S.W.2d 172, 180 (Tex. 1967)). "Under the doctrine of
legislative acceptance," in other words, "an administrative agency's construction of a statute cannot
contradict the statute's plain meaning." Id. As we base our decision on other grounds, we need not
determine the issue of ambiguity.
9. Nor, for reasons already explained, was there a longstanding, clear and consistent
Comptroller policy of construing the rolling stock exemption in the manner Reynolds proposes prior
to the 1969 reenactment of the rolling stock exemption, the basis for the 1982 recodification.
10. On rehearing, Reynolds suggests that the supreme court has not been entirely consistent
in this view, citing a case from the preceding year in which the court relied on the legislative
acceptance doctrine as the last of several grounds it cited in support of a particular construction of
a nonsubstantive recodification. See Grapevine Excavation, Inc. v. Maryland Lloyds, 35 S.W.3d 1,
5 (Tex. 2000) (citing Tex. Civ. Prac. & Rem. Code Ann. § 38.006), see also Act of May 17, 1985,
69th Leg., R.S., ch. 959, 1985 Tex. Gen. Laws 3242, 3242. In Grapevine Excavation, unlike
City Public Service Board, the court did not address whether the legislative acceptance doctrine
applied to a nonsubstantive codification, but appeared merely to assume that it did. Grapevine
Excavation, 35 S.W.3d at 5. To the extent these decisions conflict, we note that City Public Service
Board is the more recent of the two.